OCONTO ELECTRIC COMPANY, Appellant, vs. PEOPLES LAND & MANUF'G COMPANY and another, Respondents.

SAME, Respondent, vs. SAME, Appellants.

STATE EX REL. PAMPERIN, Appellant, vs. OCONTO ELECTRIC COMPANY, Respondent.

*February 16—May 15, 1917.*

*Public utilities: "Grant" of franchise: Grantee's lack of corporate power: Indeterminate permit: Quo warranto: Annulment of franchise, when may be refused although mayor was interested therein: Rights resulting from dealings and contracts with city: Exchange for indeterminate permit: Suspension or abandonment of franchise: Certificate of convenience and necessity: Street and commercial lighting: Municipal corporations: Validity of contracts: Letting to lowest bidder: Street lighting is not "work:" Change of rate by railroad commission: City council: Meetings: Fraud in awarding contract.*

1. Where, pursuant to a city ordinance purporting to grant a franchise to do commercial and municipal lighting, a corporation was doing a commercial lighting business in 1907, when the Public Utility Law (secs. 1797*m*—1 to 1797*m*—108, Stats.) took effect, it was a "public utility" and that law conferred upon it the power to do such business, although its articles of incorporation did not expressly authorize it to do so; and having continued to do such lighting it acquired an indeterminate permit therefor by virtue of ch. 596, Laws 1911 (sec. 1797*m*—77, Stats.).

2. The word "granted" in ch. 596, Laws 1911, was not used in a technical or limited sense, but covered grants legally inopera-

tive for want of corporate power of the grantee; and where, pursuant to the ordinance above mentioned, the grantee of said franchise began to do municipal lighting in 1909, two years after the Utility Law took effect, its franchise to do such lighting became an indeterminate permit under said act of 1911.

3. Even if the mayor had a pecuniary interest in a franchise granted by a city to a lighting company, the courts may properly refuse to annul such franchise in a *quo warranto* action prosecuted, not in the public right—two successive attorneys general having declined to move in the matter—or to protect the public interest, but for the personal advantage of a private relator and in the interest of a competitor seeking to acquire the business of the grantee of the franchise, especially where the facts were known to the relator and said competitor for seven years before the action was begun, during which time they lay by and permitted said grantee to build up its plant and business.

4. By the acts of the city, covering a number of years before and after the Public Utility Act took effect, in dealing with and making contracts for municipal lighting with the grantee of the franchise last above mentioned, said grantee acquired rights in the nature of a "license, permit or franchise," which in 1909 were exchangeable for an indeterminate permit under the Utility Law, although at that time said grantee was doing only commercial lighting, the contract for municipal lighting having been awarded to another company.

5. The suspension contemplated by sec. 1797m—74n, Stats. (Laws 1913, ch. 621),—providing that no public utility engaged in furnishing heat, light, etc., shall, without first obtaining a certificate of convenience and necessity, exercise any right under any franchise the exercise of which "has been suspended for more than one year,"—is a voluntary suspension of more than one year after the passage of the act. It does not cover a suspension for a year of the exercise of a franchise to do street lighting, due to the fact that the contract for such lighting was awarded to a competing company,—such a suspension being excusable, temporary, and involving no purpose to abandon.

[6. Whether the right to do street lighting and that to do private lighting should be considered as separate and distinct franchises, so that, under said sec. 1797m—74n, after the suspension of either, a certificate of convenience and necessity must be obtained before that kind of lighting could be resumed, is not determined.]

7. Abandonment means an intentional, voluntary surrender.

8. Although a lighting company which had been doing the street lighting in a city did not submit a bid for such lighting at the

expiration of its contract and, when such lighting was awarded for five years to a competing company, sold to the latter such of its equipment for street lighting as it could not use in its commercial business, this did not constitute an abandonment of its right or franchise to do street lighting, where the reason for its not submitting such bid was that it understood that it was precluded therefrom by the fact that the competing company had secured the exclusive privilege of using in that city the only lamp which would meet the requirements of the proposed contract.

9. The lighting of streets by electricity is not "work" within the meaning of a provision in a city charter that "all work for the city . . . including all printing . . . shall be let by contract to the lowest responsible bidder."

10. Every contract for such lighting is subject to having the rate thereof raised or lowered by the railroad commission, under the Public Utility Law.

11. At a regular meeting of a city council on February 3d, bids from the P. Co. and the O. Co. for street lighting were received and referred to a committee, and the letting of the contract was laid over until the regular meeting of the council in May. The meeting was adjourned "subject to the call of the mayor." Thereafter the mayor issued a call stating that the council would "meet in February adjourned meeting . . . February 25, . . . for the purpose of finishing business, etc." At that meeting the action of the council putting over the letting of the lighting contract was rescinded, and the contract was awarded to the P. Co. at a price lower than either of the bids submitted on February 3d. *Held*, that the meeting of February 25th was a legal meeting and that the proper steps were taken by the council to award the contract.

12. It appearing, however, that the mayor was the attorney of the P. Co. and that the meeting of February 25th was held to prevent the letting of the contract at the May meeting by the new council to be elected in April, to prevent the acceptance of the bid of the O. Co., and to make with the P. Co. a contract (which that company had prepared before the meeting) at a rate much lower than its previous bid and slightly lower than the bid of the O. Co.; and the P. Co. having, a few days later and before furnishing a bond to secure performance of such contract, applied to the railroad commission to increase the rate for street lighting for its benefit, it is *held* that the whole transaction shows a scheme of the P. Co. to secure the lighting contract at a price higher than that specified therein and higher than the price bid by the O. Co., and that therefore the contract so made

was void in its inception and not binding on the city, which was free in May of that year to make a contract (as it did) with the O. Co.

13. When a valid contract for street lighting made by a city with a public utility therein is duly filed with the railroad commission the rate agreed upon therein becomes presumptively reasonable and enforceable until a different rate is established in place thereof by the commission pursuant to law.

APPEALS from judgments of the circuit court for Fond du Lac county: CHESTER A. FOWLER, Circuit Judge. *One judgment affirmed; the other reversed in part.*

The first above entitled action of the *State ex rel. Pamperin* against the *Oconto Electric Company* is *quo warranto* to oust the electric company from the exercise of any franchise as a public utility in the city of *Oconto.* Reference to this action will hereinafter be made as "the *quo warranto* action." The second above entitled action was instituted pursuant to a stipulation of the parties at the suggestion of the railroad commission of the state of Wisconsin for the purpose of determining the validity of two street-lighting contracts, the legal status of the two companies as public utilities in the city of *Oconto,* and which, if either of the two companies, has the right to do the street lighting of the city for the period of five years from August 7, 1914. Reference to this action will hereinafter be made as "the equity action." We will speak of the *Oconto Electric Company* as the *"Oconto Company"* and of the *Peoples Land & Manufacturing Company* as the *"Peoples Company."* The two actions were tried together and the trial court considered them together and determined the questions involved in both actions in one decision. The facts involved in the two actions are necessarily numerous and in many respects sharp conflicts exist in the evidence supporting the ultimate conclusions of fact as found by the trial court. We shall adopt the trial court's statement of facts of the case as the ultimate facts shown by the evidence and on which the rights of the parties rest:

"The two companies are both and for many years have been doing business as public-service lighting corporations in the city of *Oconto*. Only one at a time has ever done, or from the nature of the situation ever can do, the street lighting. The competition between them has been extremely bitter and strong animosity exists between T. A. Pamperin and W. A. Holt, who are and at all times have been the ruling minds of the companies. Mr. Pamperin is manager of the *Peoples Company* and Mr. Holt is the principal owner of the Holt Lumber Company, which supplies and always has supplied current to the *Oconto Company*, and which has supplied funds to it as needed. The lumber company utilizes the sawdust and shavings from its mills as fuel to produce the current furnished to the *Oconto Company*, which would be practically worthless if not so used. Mr. Holt is a brother of the principal owner of the *Oconto Company*, who is a nonresident of the state, and looks after the interests of his brother. Both companies are Wisconsin corporations. There is nothing in the articles of incorporation of the *Peoples Company* expressly purporting to authorize it to do electric lighting, its purposes being expressed as 'dealing in real estate, manufacturing electrical goods, and doing a general business.'

"Mr. Pamperin in 1890 took charge of the only electric lighting plant then in *Oconto*. He ran this plant in one capacity or another until it was purchased by the *Peoples Company* at sheriff's sale in 1897. This plant did both the commercial and municipal lighting until it was burned in 1899, and during that year its contract for street lighting expired. In October, 1899, the city entered into a contract for street lighting with W. A. Holt, and in January, 1903, another contract for street lighting was let to him. During this time the *Peoples Company* did all the commercial lighting in the city.

"In April, 1904, Holt was elected mayor. Shortly prior to his election he assigned his contract for street lighting to W. H. Young, an employee of the Holt Lumber Company, without consideration of value. The Holt Lumber Company had been furnishing the electricity for the city lighting and continued to do so. During this time that Holt and Young held the contract, the monthly payments from the city were turned directly over to the Holt Lumber Company. It is

obvious that during this time the interests of Holt and Young in the contract with the city were merely nominal, and that the lumber company was the real party in interest under the contract.

"During 1904 an ordinance was passed by the city granting to the *Peoples Company* a franchise to do both street and municipal lighting. In December, 1905, just prior to the expiration of the Holt or Young contract, the city advertised for bids for street lighting and both Young and the *Peoples Company* submitted bids. These bids were rejected, and in February following readvertisement was had and bids were submitted by the *Peoples Company* and the *Oconto Company,* which had been organized in the meantime, the incorporators being three employees of the Holt Lumber Company. The Holt Lumber Company, in February, 1906, sold its street-lighting plant to the *Oconto Company,* and at the same time entered into a contract to furnish it power for the generation of its electricity. In July, 1906, Holt being then mayor, an ordinance was passed by the city granting to the *Oconto Company* the privilege to do commercial lighting, and in August, 1906, the city contracted with that company for street lighting for three years. At the expiration of this contract, in 1909, the city advertised for bids. Only the *Peoples Company* submitted a bid, and the *Peoples Company* was awarded a contract and began street lighting under it in August, 1909. At the time the *Oconto Company* sold to the *Peoples Company* all its poles and wires used for street lighting, and disposed of such other street-lighting equipment as it was not able to use in commercial lighting.

"In December, 1909, the *Oconto Company* took out an indeterminate permit under the Public Utilities Law. At this time it was doing only commercial lighting.

"The *Peoples Company* was not doing street lighting and had never done it when the Public Utilities Law was passed. This company did not take out an indeterminate permit under the Utilities Law, but claims that it has such under the automatic action of ch. 596, Laws 1911, which by its terms brought all public-service corporations under the Public Utilities Law and gave them indeterminate franchises in lieu of those previously exercised. . . .

"In January, 1914, the common council advertised for

bids for street lighting for a period of five years from August, 1914. At a regular meeting of the council on February 3, 1914, a bid was received from the *Peoples Company* at $47 per light per year for all-night and $43 for 'moon-light' schedule service, and one from the *Oconto Company* at $30 per light per year which did not designate which schedule of service it would give. The bids were referred to the committee on lights and the council by motion laid over the matter until the regular meeting in May, 1914. This meeting of the council was 'adjourned subject to the call of the mayor.' On February 25th another meeting of the council was had, pursuant to the call of the mayor, in terms as follows: 'The common council will meet in February adjourned meeting, Wednesday evening, February 25, 1914, at 7:30 o'clock, for the purpose of finishing business, etc.' At this meeting a motion was made and carried to rescind the action of the council putting over the letting of the lighting contract, and it was then moved and carried to enter into a contract with the *Peoples Company* for a period of five years from August, 1914, at $28 per light per year for all-night every-night service. Mr. Pamperin had this contract in readiness for signatures, and it was signed the same evening. Mr. O'Kelliher was mayor of the city, was the attorney of the *Peoples Company* and Mr. Pamperin generally, and was the attorney for the relator in the *quo warranto* action which was then pending. The relator in this action is the wife of Mr. Pamperin, and she is the principal stockholder in the *Peoples Company*.

"On March 5th, before its bond to secure the performance of said contract had been furnished, the *Peoples Company* applied to the railroad commission to increase the rate for the street lighting and to fix a rate for commercial lighting. The *Oconto Company* was made a party to this proceeding, and a hearing was finally set for June 12, 1914.

"On May 20, 1914, after the council elected that spring had taken office, a contract with the *Oconto Company* was formally executed for the furnishing of street lights at $30 per light, pursuant to its bid above mentioned. This company had notified the city in April that it would furnish all-night every-night service or service on a moon-light schedule, as the city might elect."

The court determined

(1) That the *Oconto Company* has had a valid "indeterminate permit" as defined in the Public Utility Law of this state for both street and commercial lighting in the city of *Oconto* since December 23, 1909, and that it never abandoned the public service of street lighting nor "suspended" such privilege within the meaning of such Utility Law.

(2) That the *Peoples Company* has had a valid "indeterminate permit" since July 8, 1911, to do street and commercial lighting in *Oconto*.

(3) That the contract between the city and the *Peoples Company,* dated February 25, 1914, is valid, but that the rate for service specified therein is subject to modification by the railroad commission pursuant to law; that the *Peoples Company* is not entitled to specific performance thereof; and that the city is liable in damages resulting from a breach by the city.

(4) That the contract between the city and the *Oconto Company,* dated May 20, 1914, is valid, but the rate for service specified therein is subject to modification by the railroad commission pursuant to law, and that in case of a breach thereof by the city the company is entitled to damages resulting from such breach.

(5) That upon the filing of such contracts with the railroad commission the specified rates became presumptively reasonable and binding on the parties until such commission should fix different rates, which rates would then be obligatory on the parties.

(6) That none of the parties recover costs in the equity action, except that the *Oconto Company* recover $3.82, the one half of its disbursements for state tax, clerk's and sheriff's fees.

The city of *Oconto* as defendant in the equity action has taken no active interest in the controversy, except that it asserts the invalidity of the contract dated February 25, 1914, between it and the *Peoples Company.*

The *Peoples Company* has appealed from the judgment entered in the *quo warranto* action.

All of the parties to the equity action have taken an appeal from parts of the judgment entered therein.

For the *Oconto Electric Company* there were briefs by *Allan V. Classon* of Oconto and *Greene, Fairchild, North, Parker & McGillan* of Green Bay, and oral argument by *Mr. J. R. North* and *Mr. Classon.*

For the *Peoples Land & Manufacturing Company* there were briefs by *John A. Kittell* of Green Bay, attorney, and *Classon & O'Kelliher* of Oconto and *Lynn D. Jaseph* of Green Bay, of counsel, and oral argument by *Mr. Kittell.*

For the *City of Oconto* the cause was submitted on the brief of *John B. Chase* of Oconto.

For the relator, *Pamperin,* there was a brief by *Classon & O'Kelliher* of Oconto and *Kittell & Burke* of Green Bay, and oral argument by *V. J. O'Kelliher* and *John A. Kittell.*

The following opinion was filed March 13, 1917:

Siebecker, J.    The controversies presented in the two cases have been treated in one proceeding before the trial court and were submitted together on appeal in this court. In the *quo warranto* action relator assails the *Oconto Company's* rights as claimed by it under an indeterminate permit granted pursuant to the Public Utility Law and seeks to have it annulled on the ground that the company at the time of obtaining such permit had no legal license, permit, or franchise from the city to exchange for such indeterminate permit, as called for by the provisions of the Public Utility Law.    The action of the *Oconto Company* against the *Peoples Company* and the city of *Oconto* involves the right of both companies to conduct the business of street and commercial lighting in the city of *Oconto* and the validity of the street-lighting contracts of 1914 between the city and the *Peoples Company* dated February 25th, and a second contract between the city and the *Oconto Company* dated May

20th. Upon the facts as above stated the trial court held that the two companies were holding lawful indeterminate permits and that they have been conducting their public businesses in the city of *Oconto* under such permits from times prior to the commencement of these actions and that the contracts above referred to were valid obligations and binding upon all the parties. The court in an elaborate and well considered opinion states the grounds of its decision upon all of the questions determined by the judgment. We shall adopt the views of the trial court as expressed in its opinion on the litigated questions in so far as its conclusions harmonize with the views of this court upon the questions presented here.

On the question of the legal status of the *Peoples Company* the court declared:

"This company was doing commercial lighting in 1907 when the Utility Law went into effect. Under the rule of *Calumet S. Co. v. Chilton,* 148 Wis. 334, 347, 348, 135 N. W. 131, notwithstanding the limitations of its articles of incorporation, it was a public-service utility and a Wisconsin corporation, and the Utility Law conferred upon it the power to exercise the privileges it was at the time in fact exercising. It has continued to do such lighting up to this time, and there is no doubt that it has an indeterminate permit therefor.

"How about its power to do municipal lighting? It did not begin such lighting until two years after the Utility Law went into effect. Such lighting was done by the *Oconto Company* until it was taken up by the *Peoples Company,* but at such time the *Oconto Company* had not yet taken an indeterminate permit, so there was no need for the *Peoples Company* to get a certificate of convenience and necessity under sec. 1797m—74 in order to commence such lighting. It now has an indeterminate permit for such lighting under ch. 596, Laws 1911, if a 'license, permit or franchise' therefor was 'granted' prior to the passage of the Utility Law within the meaning of that chapter. It must be conceded, I think, that the ordinance purporting to grant a franchise to the *Peoples Company* was ineffectual as a legal grant because of want of power by the company under its articles of incor-

poration to do a lighting business. But I think that notwithstanding this, the ordinance 'granted' a franchise within the meaning of ch. 596. The word 'granted' was not used in a technical sense or a limited sense, but covered grants legally inoperative for want of corporate power of the grantee, just as the original sec. 1797m—77, which ch. 596 amends, covered permits or licenses being exercised under void grants. The assumption of municipal lighting by the *Peoples Company* seems to me referable to the ordinance, and it is therefore a 'grant' within the meaning of said ch. 596. Ch. 217, Laws 1911, validating franchises surrendered for an indeterminate permit notwithstanding any 'defect, irregularity or invalidity' therein, strengthens this view. It was the intention of both sections to validate and confirm and create into indeterminate permits all privileges of whatever sort actually being exercised in 1911 when these laws were passed, regardless of how their exercise began and no matter what they were referable to. As said in the *Calumet Service Company Case* (148 Wis. 367) : 'The law must be given a reasonable,—sensible,—construction, at all points, to the end that the legislative intent shall not fail, instead of looking with favor upon technical assaults upon it.' "

On the question of relator's right to have the *Oconto Company's* indeterminate permit annulled the trial court correctly held:

"I am of the opinion that Mr. Holt was 'indirectly interested' in the franchise issued to the *Oconto Company*. . . . But whether the state would . . . move [to oust the company from its franchise] was for the attorney general to determine, and he determined not to bring suit but to leave the prosecution to the relator. Manifestly this suit is prosecuted, not at all in the public right, but for the personal advantage of the relator, or rather that the company in which the relator is a stockholder may acquire the *Oconto Company's* business through the taking away of its franchise. The suit is only another skirmish between the embattled companies, each of which is apparently more bent on the destruction of the other than it is on its own welfare. The *Peoples Company* knew of the facts respecting Mr. Holt's interest at the time the franchise was granted as well and as fully as it

knew them when this suit was started. It alleged the ultimate fact as a ground of relief in the *mandamus* action brought by it in 1906 to compel the letting to it of a lighting contract. That Mr. Pamperin was the instigator of that action, as he now is of this, is manifest. Both actions must be considered as in reality actions of the *Peoples Company*. The petition in that case was verified, so that the evidentiary facts to substantiate the claim of interest were presumably as well known to the company then as they were when this action was commenced. Not only did the *Peoples Company* know the fact, but so did the relator herself. Seven years elapsed between the commencement of the actions. With that knowledge the relator and the *Peoples Company* lay by for that term and saw the *Oconto Company* build up its plant and business, and now, not at all for the purpose of vindicating a public right or protecting the public interest, but for the vindictive and selfish purpose of destroying a competitor and seizing its business, would have the *Oconto Company's* franchise annulled. I cannot believe that the court is compelled to annul the franchise under such circumstances, especially when two successive attorneys general have declined to move in the public right. It may be further stated as additional reason for denying the relief, that the record shows that the *Peoples Company* has resorted to practices as contrary to fair dealing and as subversive of the public good as the conduct of Mr. Holt or the *Oconto Company* in connection with the granting of the franchise."

We will consider hereinafter the rights of the *Oconto Company* arising out of its commercial and street-lighting business up to August, 1909, and its commercial lighting business after the *Peoples Company* had secured the three-year street-lighting contract from the city in August, 1909, respecting the claims that it had abandoned or suspended the street-lighting business within the contemplation of the Utilities Act.

Was the *Oconto Company* at the time it applied for an indeterminate permit in December, 1909, operating a public utility as defined in such act? Notwithstanding the imperfect inception of the rights then being exercised by the com-

pany and which it surrendered in exchange for the indeterminate permit, they were of a nature and substance which constituted a "license, permit or franchise" exchangeable for the indeterminate permit granted by the commission under the Utility Act.  As held in *Calumet S. Co. v. Chilton,* 148 Wis. 334, 135 N. W. 131:

"The legislature did not rest the matter, as it might have done, by mere use of the term 'franchise.'  The broad term was used instead, 'license, permit or franchise,'—in short, any public privilege of any sort to do any kind of the service mentioned within the scope of the Public Utility Law, followed by the term 'franchise' as a synonym for the entirety."

And so here the *Oconto Company* had acquired rights in the nature of a "license, permit or franchise" by the acts of the city throughout their dealings and contracts from 1899 to the time it applied for the indeterminate permit.  The facts of the case sustain the conclusion that the *Oconto Company* had and was operating its public utility under a "license, permit or franchise" of the city, and the surrender thereof entitled it to an indeterminate permit in December, 1909.  Since these rights are not necessarily dependent solely on the ordinance of July, 1906, it is not necessary to consider the question whether the provisions of ch. 217, Laws 1911, abrogated whatever rights the *Oconto Company* had under such permit, nor need we consider whether or not the provisions of this chapter were intended to affect permits in existence when it was adopted.

The trial court's conclusion on the question of the *Oconto Company's* power to do street lighting seems to be well sustained upon the grounds set forth in the opinion:

"It is claimed by the *Peoples Company* that it [*Oconto Company*] has no such power because it abandoned the field of street lighting in 1909 and has not entered it since.  It is also claimed that it has 'suspended' the privilege of street lighting for more than a year and that under sec. 1797m—74n it has no power to resume it without a certificate of necessity and convenience.

"As to the latter point, the statute referred to should not be given a retroactive effect. The suspension covered by it should be construed to be a suspension of one year after its passage. The act, ch. 621, Laws 1913, was published July 12, 1913. The *Oconto Company's* bid was submitted on February 3, 1914. Since that time its 'suspension' of street lighting has not been voluntary. And the suspension referred to by the statute must be a voluntary suspension. . . . The statute can hardly have intended to give one of two competing utilities an indeterminate permit for street lighting and to deprive the other of such permit therefor merely because the one gets from the city wherein they are situated a contract for a year's street lighting. . . . A suspension of one year under these circumstances would be an 'excusable, temporary suspension, involving no purpose to abandon.' As further said in the *Calumet Service Co. Case,* p. 367, 'The law must be given a reasonable,—sensible,—construction, at all points, to the end that the legislative intent shall not fail.'

"Either the above must be the correct view or we must, as it seems to me, construe the statute as not intending to differentiate street lighting and private lighting as separate and distinct franchises, but intended to consider them both as within the single franchise of lighting. It is true that the courts have distinguished between the two kinds of lighting, in some respects, but it does not follow that they constitute distinct franchises. It is plain from sec. 1797m—74m that the Utility Law aims to protect competing companies in their franchises. The statute by its terms applies only to companies the granting of whose franchises were pending at the time a competing company takes out or secures an indeterminate permit. But if the statute intended to protect such franchises, it certainly was contemplated that franchises already existing were protected, either by that section or otherwise.

"Considering the question as one of abandonment, irrespective of mere suspension. Abandonment means an intentional, voluntary surrender. In 1909, when the *Oconto Company's* contract for street lighting was about to expire, the *Peoples Company* desired to enter the field—which it had never theretofore entered notwithstanding its 'grant' in its ordinance. The council advertised for bids which were, or

which the *Oconto Company* thought were, framed with a view to preclude it from complying with them. To satisfy the test incorporated in the advertisement would necessitate the company's discarding its old lights and substituting new ones. There was only one lamp made which could meet the test required by the proposal for bids, and the *Oconto Company* on inquiry was informed and believed that it could not procure these lamps because the *Peoples Company* had secured the exclusive privilege of using them in *Oconto.* Whatever the facts may have been as to the *Oconto Company's* actual ability to procure these lamps, it seems clear that it understood that it could not get them and was thereby precluded from bidding. . . . It in fact submitted no bid, but it did not intend to give up the privilege of street lighting forever or surrender the franchise it then had therefor. The contract was let for five years, and it therefore could not resume street lighting for that period. Its sale, when and shortly after the *Peoples Company* took over the street lighting, of its poles and lights and such other equipment for street lighting as it could not use in its commercial business, does not evidence an intent, either at the time or subsequently, to abandon the street-lighting privilege. Its equipment was liable to go entirely out of use during the term of the contract and the property thus become a total loss by keeping it, and its sale is reasonably referable to a desire to avoid loss."

The controversy concerning the validity of the contracts made by the city with each of the companies dated respectively February 25, 1914, and May 20, 1914, was determined by the judgment.

We consider that the trial court correctly determined that the provisions of the city charter requiring that contracts for "work," "including printing," should be let to the lowest bidder in the manner contemplated by the charter provisions are not applicable to contracts for street lighting. The basis of its decision on this point is stated as follows:

"It has been held quite generally that lighting is not 'work' within similar provisions, for the reason that there is ordinarily but one plant in a city that can furnish such serv-

ice and therefore only one concern that can bid, so that the purpose of the provision, which is to secure competition, necessarily cannot apply. *Oconto* contained no public-service plant for either public or private lighting in 1882, when the charter provision was adopted. At that time, if public lighting by electricity was contemplated in the future at all, it was necessarily contemplated to be furnished under ordinary conditions, and the charter provision cannot therefore have been intended to cover contracts for such lighting. It was not until 1899 that competition in electric lighting was possible. I am of the opinion that public lighting by electricity is not 'work' within the charter provision. There was therefore no necessity to advertise for bids. There being no necessity, the advertising done, like the advertising of private individuals, was nothing but an invitation to submit offers, and, like a private individual, the city was not bound to accept the lowest or any offer made in response. . . .

"But both contracts were made subject to the provisions of the Public Utility Law. The city, as well as private individuals, was subject to that law. The city, no more than a private person, could make a contract that would give to it any special privilege. *Kilbourn City v. Southern Wis. P. Co.* 149 Wis. 168, 135 N. W. 490. This case is to the precise point that a contract by a municipality for free public lighting is void as against the public policy of the Utilities Law, on the ground, primarily, that the law contemplates that municipalities, like individuals, shall pay a reasonable compensation for the services received. . . .

"My view of the matter is that if the contract rate is filed with the rate commission, . . . that rate is presumptively reasonable and therefore valid as long as the commission leaves it in force, and that compensation for service at the contract rate can be collected until the commission, on application or of its own initiative, fixes a different rate upon investigation and hearing. Every such contract is subject to having the rate thereof raised or lowered by the commission. Sec. 1797m—32 contemplates changes of rate by a utility without first procuring the approval by the commission. Sec. 1797m—33 provides that such a rate 'shall be the lawful rate' until it is changed by the commission. Secs. 1797m—49 to 1797m—51 empower the commission to fix rates on its own motion."

It is claimed by the *Oconto Company* that the contract made between the city and the *Peoples Company* on February 25, 1914, is invalid. It is averred on this point that the council meeting of February 25, 1914, at which the common council authorized the contract, was not a legal meeting of the common council. This meeting was held upon the written notice set forth in the foregoing statement of facts. The council met pursuant thereto and authorized the making of this contract. We consider that the trial court's holding that the meeting was a legal one and that the proper steps were taken by the common council to order this contract is correct. But we cannot agree with the trial court that the action of the officers and agents of the *Peoples Company* in making this contract shows that they in good faith intended to carry out the agreement and that it is a valid obligation and binding on the city. The facts pertinent to this question are as follows:

"In January, 1914, the common council advertised for bids for street lighting for a period of five years from August, 1914. At a regular meeting of the council on February 3, 1915, a bid was received from the *Peoples Company* at $47 per light per year for all-night and $43 for 'moon-light' schedule service, and one from the *Oconto Company* at $30 per light per year which did not designate which schedule of service it would give. The bids were referred to the committee on lights and the council by motion laid over the matter of letting the contract until the regular meeting in May, 1914. This meeting of the council was 'adjourned subject to the call of the mayor.' On February 25th another meeting of the council was had, pursuant to the call of the mayor, in terms as follows: 'The common council will meet in February adjourned meeting, Wednesday evening, February 25, 1914, at 7:30 o'clock, for the purpose of finishing business, etc.' At this meeting a motion was made and carried to rescind the action of the council putting over the letting of the lighting contract, and it was then moved and carried to enter into a contract with the *Peoples Company* for a period of five years from August, 1914, at $28 per light per year for all-night every-night service. Mr. Pamperin had this contract

in readiness for signatures, and it was signed the same evening. Mr. O'Kelliher was mayor of the city, was the attorney of the *Peoples Company* and Mr. Pamperin generally, and was the attorney for the relator in the *quo warranto* action which was then pending. The *relator* in this action is the wife of Mr. Pamperin, and she is the principal stockholder in the *Peoples Company.*

"On March 5th, before its bond to secure the performance of said contract had been furnished, the *Peoples Company* applied to the railroad commission to increase the rate for the street lighting and to fix a rate for commercial lighting. The *Oconto Company* was made a party to this proceeding, and a hearing was finally set for June 12, 1914.

"On May 20, 1914, after the council elected that spring had taken office, a contract with the *Oconto Company* was formally executed for the furnishing of street lights at $30 per light, pursuant to its bid above mentioned. This company had notified the city in April that it would furnish all-night every-night service or service on a moon-light schedule, as the city might elect."

It is manifest from the steps taken by the mayor and the common council that the February 25, 1914, meeting was held to prevent letting of the lighting contract at the May meeting by the new council to be elected in April. The proceedings of this meeting and the active part in the transaction by Mr. Pamperin in changing the *Peoples Company's* bid from $47 per light to $28 per light, thereby reducing it below the $30 bid of the *Oconto Company,* and his action in having the contract at the reduced rate prepared before the meeting and having it signed at this meeting, and the acquiescence of the city officials in all these transactions, indicate that the main purpose of the whole transaction was to prevent acceptance of the *Oconto Company's* offer to furnish light at the rate of $30 per light. Coupling these acts with those of the *Peoples Company's* representative on March 5th, before the company furnished a bond to secure performance of this contract, by applying to the railroad commission to increase the rate for street lighting for its benefit under this

contract, it is obvious that this was a scheme to secure the street-lighting contract at a price higher than the price specified in the contract or the price at which the *Oconto Company* offered to furnish light. The whole transaction shows an attempt to make a pretended contract for a rate per light much less than its bid, with the intent to secure a higher rate than the *Oconto Company's* bid through the action of the railroad commission. This wrongful conduct violated the transaction and justified the newly elected common council in treating the contract as void from its inception and enabled it to contract with the *Oconto Company* on the following 20th of May.

The conclusions from the foregoing are that the *Peoples Company* has no valid contract for street lighting with the city and that the city was at liberty to enter into the contract with the *Oconto Company* as it did on May 20, 1914. The facts and circumstances surrounding the making of this contract (Exhibit B) make it valid and obligatory upon the parties thereto. Upon filing it with the railroad commission the rate agreed upon therein became presumptively reasonable and enforceable until a different rate is established in place thereof by the railroad commission pursuant to law.

Upon the foregoing consideration of the cases it necessarily follows that the judgment in the *quo warranto* action must be affirmed, and that the *Peoples Company* take nothing upon its appeal in the equity action; that upon the appeals of the *Oconto Company* and the city of *Oconto* the judgment in the equity action is reversed in so far as it is adjudged that the contract between the city of *Oconto* and the *Peoples Company* dated February 25, 1914, is valid, and in all other respects the judgment is affirmed.

*By the Court.*—The judgment appealed from in the case of the *State of Wisconsin ex rel. N. E. Pamperin* against the *Oconto Electric Company* is affirmed.

The judgment appealed from in the case of the *Oconto Electric Company* against the *Peoples Land & Manufactur-*

*ing Company* and the city of *Oconto* is reversed in part and affirmed in part on the appeal of the *Oconto Electric Company,* as indicated in the opinion, and that the defendant *Peoples Land & Manufacturing Company* take nothing on its appeal therefrom.　No costs are allowed in the equity case to either party; the *Peoples Land & Manufacturing Company* to pay the clerk's fees in this court in the equity case.

A motion for a rehearing was denied, with $25 costs, on May 15, 1917.