GEORGE H. GOODRICH v. NORTHWESTERN TELEPHONE
EXCHANGE COMPANY.[1]

December 5, 1924.

No. 24,104.

**Contract void.**
   1. A contract based upon an illegal consideration is void.

**Public welfare superior to private contracts concerning rates.**
   2. Private contracts fixing rates must yield to the public welfare
when determined in an appropriate manner by authority of the state.

**Void contracts.**
   3. Contracts for the purchase of the influence of a majority of
a city council, and contracts for the purchase of the influence of
private persons upon the action of present and future city councils
are against public policy and are void; and, this is true regardless
of purity of motive.

**No waiver of invalidity.**
   4. There can be no estoppel or waiver of such invalidity; the de-
fense is allowed not for the sake of the party litigant but for the
sake of the law itself.

After the former appeal reported in 148 Minn. 219, 181 N. W.
333, the case was tried before Giddings, J., who granted plaintiff
a permanent injunction. From an order denying its motion for a
new trial, defendant appealed. Reversed with direction to enter
judgment in favor of defendant.

*Cobb, Wheelwright, Hoke & Benson* and *E. A. Prendergast,* for
appellant.

*Will A. Blanchard,* for respondent.

[1]Reported in 201 N. W. 290.

WILSON, C. J.

This case has been in this court before and a very full statement of the facts is found in 148 Minn. 219, 181 N. W. 333. Relative to the consideration for the contract, as imposed upon plaintiff and 17 other persons, who were parties of the second part as expressed in the contract, we find this language:

"In consideration of the concessions made as aforesaid, and in view of the general compromise and settlement of the telephone situation, second parties agree to use all reasonable means to prevent telephone agitation in the city of Anoka and endeavor to secure and cause to be maintained friendly relations between the first party and its patrons."

The allegations of the complaint that the contract was made were met by a general denial in the answer. This written instrument was signed April 21, 1908, and the 18 signers, as parties of the second part, included the mayor and 3 members of the city council which was composed of 6 members and the mayor. In fact, the city council selected a committee, and the local commercial club selected a committee, and these two committees selected the 18 men as a general committee to negotiate with defendant. The 18 men signed the contract. Shortly prior to that time the Tri-State Telephone Company, which then had merely a long distance station in the city, had made application to the city council for a franchise to install and operate a local exchange in Anoka. This was inimical to the interests of defendant. The evidence now explains the meaning of "telephone agitation" as used in the contract. It is made to appear that what these 18 men agreed to do, as a consideration for this contract, was to use their influence not to let the Tri-State Telephone Company come into Anoka; that they would not support another company; that each individual member of the committee was to use his influence, where necessary, to keep the Tri-State from obtaining any concessions. The purport of the whole thing was simply this: The Tri-State was trying to get a franchise to put a local exchange in and the defendant did not want this, and these men tried to put a "damper" on the Tri-State getting

subscribers, and they agreed to use their influence against this, and they did so use such influence.

Thereafter the Tri-State made some effort to get into Anoka, but in the language of one of the committee "it never made any progress." "The personnel of the committee was sufficient for that." In other words, he said, this committee was such that its influence on the city council was all that was necessary. He further testified that in his opinion their influence was strong enough to prevent any subsequent city council permitting the Tri-State to get into Anoka. This opinion is supported by the fact that the Tri-State did not get a franchise. The defendant had in 1908 about 700 subscribers and the contract was to continue until its subscribers reached 1,000.

Is a contract based upon such consideration valid? Here we have a majority of a city council, with other leading citizens, making an agreement to exert their influence upon the city council relative to a matter then pending before it. The contract committed all these parties to that action for an indefinite time regardless of changing conditions which might affect the public interest; and the council thus became fettered by this action so that it could not later exercise freedom of judgment on then unknown future opportunities. True, they got what is now a discriminatory rate, but they gave up and surrendered the free judgment of the council as to all other opportunities. The council was deprived of the power of discretion, always desirable, concerning matters of public concern.

The individual men who were not city officials contracted to exercise their influence upon the local legislative body; the 18 men contracted to exercise such influence upon future legislative bodies regardless of changed conditions. In short, these men were undertaking, in consideration of the rates made by defendant, to sell their influence upon the city council, as well as to disarm the existing council of freedom of judgment and power of discretion. These men are not charged with corrupt intent. Far from it. They were doubtless merely trying to drive a good bargain.

A contract based upon an illegal consideration is void. Dunnell, Minn. Dig. § 1875. A city council should always be free to exercise

its judgment and discretion, in making contracts for the city, so that it may contract with persons who will execute them most faithfully and at the least expense to the taxpayers. Considerations as to the most efficient and economical mode of meeting the public wants should alone control. It must at all times be a free agency to obtain and give service. Such rule is dictated by public policy and whatever violates this rule is against public policy. The restriction upon the council, now under consideration, placed there by a majority of its members, and the agreement, by private citizens, to use their influence upon the existing and future councils, introduce elements into the transaction that do not have the approval of public policy. Assuming that the three members of the council, who were not parties to this agreement, but who were perchance the unconscious victims of this contractual influence, would try to follow the dictates of their judgment and discretion in matters incompatible with the secret consideration of this agreement, we can readily see how the efficiency of their ability would be throttled by the invisible but controlling influence. Such extraneous secret influence on legislative officials received, perhaps, in the best of faith as coming from a free and untrammeled motive, is dangerous in the extreme. It was in essence and in effect against the soundest principles of public policy. This element was not disclosed by the writing itself. Why should the court uphold a contract based upon a secret consideration, which, if known, would tend largely to defeat its purpose? This is the best evidence of the insidious tendency of such agreements. In fact this should be regarded as a conclusive badge of corrupt motive—not in the sense that there was, in fact, such—but in the sense that, under such circumstances, the court will not listen to a claim of good motive.

Judicial aid will not be given to either party to such an agreement, not because it wants to help either party, but because the agreement is tainted. 9 Cyc. 546. The fact that one of the parties will be benefited by the refusal to enforce such a contract is of no moment. In the instant case, however, it must be remembered that respondents are seeking to uphold a discriminatory rate. Then, the contract is of no great importance to respondents, because, if

upheld as against the present attack, it would have to fall under the power of the Railroad and Warehouse Commission at any time it might find that the discriminatory rate was an unreasonable one. Private contracts must yield to the public welfare when determined in an appropriate manner by authority of the state. Union Dry .Goods Co. v. Georgia Public Service Corp. 248 U. S. 372, 39 Sup. Ct. 117, 63 L. ed. 309, 9 A. L. R. 1420; Producer's Transp. Co. v. Railroad Com. 251 U. S. 228, 40 Sup. Ct. 131, 64 L. ed. 239; Atlantic Coast Line R. Co. v. City of Goldsboro, 232 U. S. 548, 34 Sup. Ct. 364, 58 L. ed. 721; Rail & River Coal Co. v. Yaple, 236 U. S. 338, 35 Sup. Ct. 359, 59 L. ed. 607; Adams v. N. W. Tel. Ex. Co. 44 S. D. 187, 183 N. W. 113. The whole theory is to have rates for public utilities that are both reasonable and equal. The people of the state are interested to that extent. Respondents should not expect more. If the rate in this contract is a reasonable one the commission will not permit an unreasonable one to be substituted.

. Persons with these secret agreements in mind, and relying upon them for their gain, do not act toward the public and third persons as they would without them. Whatever tends to divert the attention of the councilmen from their duties, to mislead their judgment, or to substitute other motives for their conduct or subject them to follow sinister and secretive motives must necessarily tend to impair the integrity of official conduct. But such agreements are so contrary to the principles of American government and our jurisprudence and so fraught with temptation that they should be condemned at every appearance. The law closes the door to temptation by refusing recognition to any such contracts, regardless of purity of motive. Private citizens—much less public officials—cannot sell their personal influence over a city council; and public officials cannot bargain away their future judgment and discretion upon matters of public concern. Such contracts are contrary to a sound public policy and void. Obviously they lead to inefficiency in the public service. In the instant case, not only was competition completely stifled, but it was, in fact, put to death. These men, in their zeal to give service to their community, doubt-

less acted in the best of motives, but, if a rule is established that will permit an act of such character to stand, it will also let others stand which are inspired by a different motive.

In fact, the prevailing rule is that such agreements are illegal, and the conclusions have not been reached upon the theory that improper influences were to be used, but upon the corrupting tendency of such agreements. "The law meets the suggestion of evil and strikes down the contract from its inception." Such agreements are not consistent with sound morals. They call for the same jealous protection as the principle contained in Stone v. Bevens, 88 Minn. 127, 92 N. W. 520. Straw should be kept away from the fire. In other words, the best punishment is to prevent the wrong. The law guards against the incidental temptation that must necessarily accompany such agreements. In short, contracts for the purchase of the influence of a majority of a city council and contracts for the purchase of the influence of private persons upon the action of present and future city councils are against public policy, and for that reason are void. Influence in this sense is not a salable article under our system of laws and morals. Oscanyan v. Arms Co. 103 U. S. 261, 26 L. ed. 539; Doane v. Chicago City Ry. Co. 160 Ill. 22, 45 N. E. 507, 35 L. R. A. 588; Tool Co. v. Norris, 2 Wall. 45, 17 L. ed. 868; 13 C. J. 429, 434; 6 R. C. L. 730, 741; Marshall v. B. & O. R. Co. 16 How. 314, 14 L. ed. 953; Rose v. Truax, 21 Barb. (N. Y.) 361; Stirtan v. Blethen, 79 Wash. 10, 139 Pac. 618, 51 L. R. A. (N. S.) 623; Sussman v. Porter (C. C.) 137 F. 161; Dodson v. McCurnin, 178 Iowa 1211, 160 N. W. 927, L. R. A. 1917A, 1084; Hazelton v. Sheckells, 202 U. S. 71, 26 Sup. Ct. 567, 50 L. ed. 936, 6 Ann. Cas. 217; Smith v. Applegate, 23 N. J. Law, 352; Davis v. Janeway, 55 Okl. 725, 155 Pac. 241, L. R. A. 1916D, 722.

Of course the individual has the right to approach legislative bodies and by petition, by legitimate argument, and by a fair showing of the circumstances, appeal to the judgment and reason of the legislative officials for or against any proposed measure. But that is not this case. We are in accord with the prevailing rule as above stated. Our decisions are in harmony with it. Houlton v. Dunn, 60 Minn. 26, 61 N. W. 898, 30 L. R. A. 737, 51 Am. St. 493; Van

Slyke v. Andrews, 146 Minn. 316, 178 N. W. 959, 12 A. L. R. 1068; Seitz v. Michel, 148 Minn. 80, 181 N. W. 102, 12 A. L. R. 1060; Wells v. Floody, 155 Minn. 126, 192 N. W. 939. We hold the contract void as contrary to public policy.

On oral argument it was urged that the defense of invalidity of this agreement could not be urged because not pleaded. This position is untenable. The action is brought upon the theory that plaintiff has a valid contract. The invalidity may be shown under the general denial. Oscanyan v. Arms Co. 103 U. S. 261, 26 L. ed. 539; Roberts v. Criss, 266 F. 296, 11 A. L. R. 698; Handy v. St. Paul Globe Pub. Co. 41 Minn. 188, 42 N. W. 872, 4 L. R. A. 466, 16 Am. St. 695; Primeau v. Granfield, 193 F. 911, 114 C. C. A. 549, 13 C. J. 507.

The trial court found as a fact, that the defendant was estopped to deny the validity of the contract. This finding is based upon a misconception of the law. There can be no estoppel any more than there can be a waiver. "The defense is allowed not for the sake of the defendant but of the law itself. The principle is indispensable to the purity of its administration. It will not enforce what it has forbidden and denounced * * * Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection would be tainted with the vice of the original contract, and void for the same reasons. Wherever the contamination reaches it destroys. The principle to be extracted from all the cases is, that the law will not lend its support to a claim founded upon its violation." Oscanyan v. Arms Co. supra. [103 U. S. 268].

Order reversed with direction to enter judgment for defendant.

Stone, J., took no part.