JOHN J. REGAN AND OTHERS v. CHARLES M. BABCOCK AND OTHERS.
STATE OF MINNESOTA, INTERVENER.[1]

Nos. 29,227, 29,241, 29,242, 29,243, 29,244, 29,245, 29,256, 29,257, 29,258, 29,259, 29,260, 29,261.

February 10, 1933.

[1]Reported in 247 N. W. 12.

*Briggs, Weyl & Briggs* and *C. J. Rockwood,* for plaintiff-appellants.

*Daggett & Redlund,* for Nolan Bros. Inc. and Clement F. Sculley Equipment Company.

*Donald O. Wright,* for Central States Construction Company and S. J. Reader Company.

*Cobb, Hoke, Benson, Krause & Faegre* and *L. M. Staples,* for Al Johnson Construction Company.

*Stearns, Stone & Mackey,* for Fielding & Shepley, Inc.

*Henry N. Benson,* Attorney General, and *James E. Markham* and *Charles E. Phillips,* Deputy Attorneys General, for intervener.

*William K. Montague* filed a brief as amicus curiae.

LORING, JUSTICE.

These appeals involve six taxpayers' suits brought to have as many highway paving and grading contracts declared void and for injunctive relief to prevent the performance of such contracts and payment of the contract prices by the state. The contractor defendants demurred to the complaints. The demurrers were sustained, and the plaintiffs have appealed. The defendants Babcock and Ellison, the highway commissioner and engineer, joined in an answer, as did the defendants Pearlove, Erickson, and Wittich, commissioners of administration and finance. The state of Minnesota through the attorney general intervened and realleged all of the allegations of the plaintiffs' complaints. The plaintiffs sought to amend their complaints by alleging knowledge by the state officers of the conspiracy on the part of the contractors, but their motion to do so was denied by the trial court. The contractors demurred to the complaints in intervention and have appealed from the orders overruling those demurrers. The contractors also moved to strike out the complaints in intervention and have appealed from the orders denying that motion.

We pass upon the allegations of the complaints upon the assumption that they are true, as must be done in case of demurrer. Where in this opinion we state facts, they are statements of alleged facts. This will avoid the inconvenience of repeating the phrase "it is alleged." For convenience also the contracts in excess of 100,000 square yards of paving may be referred to as major projects; those involving less than that yardage as minor projects.

February 26, 1931, the governor of Minnesota issued to the commissioner of highways an order which read as follows:

"Henceforth in awarding road construction contracts you will put in force, and compel compliance with, the following condition precedent:

"To be eligible to bid or be awarded a contract or contracts to construct more than 100,000 square yards of paving for the State of Minnesota, a bidder shall have completed successfully contracts with the Minnesota Highway Department for not less than 100,000 square yards of paving."

The department of highways complied with this direction, and in preparation for doing the 1932 paving published the first advertisement for bids for letting seven contracts, which included the six projects covered by the six complaints here involved. These six projects each involved more than 100,000 square yards of paving. The seventh project involved less than 100,000 square yards, and for convenience may hereinafter be referred to as project No. 7.

The date set for receiving bids on the seven projects was November 10, 1931. November 6, 1931, the highway department addressed all contractors which it considered eligible under its rules, advising them whom it considered eligible for major projects and those eligible for minor projects. Ten of the contractors were stated to be eligible for the minor and 24 for major projects. Definite limits were placed upon the amount of paving that should be let to each during 1932. The contractors who were eligible to bid on major projects under this order conspired and colluded together for the purpose of controlling bids on all projects exceeding 100,000 yards and for the purpose of allotting among themselves all paving work

to be done in the state for the year 1932, to the exclusion of all other bidders. October 26, 1931, the contractors met and, in furtherance of the conspiracy, appointed a committee to apportion and allot the paving work for 1932 among themselves; and on October 30 they met again and appointed a committee of their number to assign to each contractor the project on which such contractor should be the low bidder and to fix the amount of such bids, as well as that of the complimentary bids to be made by all other contractors bidding upon the project. The six contracts here involved were allotted to the six contractors who are the defendants in these actions. The highway department advised the conspiring contractors that they would be the only ones who would be permitted to bid on any one of the six major projects which were to be let on November 10, 1931. The highway department adopted the same list of eligible contractors that the conspiring contractors had previously prepared. In conformance to the suggestion of the contractors, they were classified on the basis of the number of paving outfits which they might operate, each contractor being allowed 15 miles of pavement for each mixer or outfit. The department also advised the contractors that if any change was made in the classified list of contractors all contractors would be advised. The contractors were also advised that if any contractor should be low bidder on projects exceeding the mileage for which he was listed the department would award a contract only on the basis of the mileage allotted to him.

November 9, 1931, all of the conspiring contractors met, and their committee allocated to each one the amount he or it should bid in order to make certain that the one to whom each project had been allotted would be the low bidder therefor. November 10 these bids so agreed upon were made to the department of highways, and in consequence the six contractors here involved were the low bidders upon their respective projects. Such bids were greatly excessive in amount and in fact not competitive, and were made for the purpose of preventing competition and to defraud the public and taxpayers of the state of Minnesota. The aggregate amount of

these six bids exceeded a reasonable price for the work by over half a million dollars. No contractors who were not on the eligible list were permitted to bid on these projects. Some offered to bid but were denied the privilege. Certain contractors subsequently convinced the highway department that they were eligible and were added to its selected list. Certain contractors who were refused the right to bid were adequately financed and equipped for such work and had actually completed paving in the states of Iowa and Illinois in amounts running into millions of yards. At least six contractors who were refused the right to bid in these six paving projects on November 10, 1931, were fully qualified, competent, and equipped in every respect satisfactorily to perform and complete such contracts. The paving work for the year 1932 was so arranged that no other contractor could under the rules of the department qualify to bid on a major project.

Project No. 7, upon which bids were invited November 10, 1931, was less than 100,000 square yards in extent. The specifications for the pavement on this project were the same as those upon the major projects. Because of its being a minor project the bidding was open to more contractors than was the bidding on the major projects. It was in a measure competitive. It was let to McKenzie & Kileen at 91 cents per square yard of paving. For the paving on this project Nolan Bros., one of these defendant contractors, bid 94 cents per square yard, three cents above the McKenzie & Kileen bid; whereas for the paving on the major project allotted to Nolan Bros. its bid was $1.44 per square yard, and such bid was the low bid therefor. There was a difference of 50 cents per square yard between Nolan Bros.' bid in competition with McKenzie & Kileen and its bid on the project where it had no competition. Its bid on the larger project was more than 50 per cent higher than on the competitive work.

It is charged in the complaint that the actual cost per mile of laying the pavement on project No. 7 was the same as on the larger projects, except for the possible higher rate of overhead on No. 7. Previous contracts for like paving during the fall of 1931 had been

let to Nolan Bros. and others at a price around one dollar per square yard, the contractor to furnish his own steel. On the projects now before us the state supplied the steel.

The complaints in these actions were filed with the clerk of court in Ramsey county May 12, 1932, and copies served upon all defendants. May 16, 1932, the attorney general filed the state's petition for intervention and adopted and realleged all the allegations of the plaintiffs' complaints in each action and prayed that the contracts be adjudged void and of no effect. May 25, 1932, the attorney general, together with the department of highways and the commission of administration and finance, entered into an agreement with the contractors and their surety company by which the contractors were to complete the work called for by their contracts and to be paid 80 per cent of the contract price, the remaining 20 per cent to abide the event of these actions, or, "if not so determined," to be disposed of "as may be otherwise determined according to law." It is claimed by the plaintiffs that the 80 per cent of these contracts so agreed to be paid by the state exceeds a reasonable price by over $150,000. The plaintiffs sought to plead this stipulation by supplemental complaint. This motion was denied.

The trial court sustained demurrers to the plaintiffs' complaints, overruled those to the state's complaint in intervention, and denied the motion of the defendants to strike out the complaint in intervention. It treated the contracts based upon the bids as voidable and not void, and held that the state had made an election which compelled it to resort only to its right to damages for fraud.

The errors assigned on these appeals are that the district court erred in sustaining the demurrers to the plaintiffs' complaints, in denying the plaintiffs' motion to amend their complaints, and also in denying their motion to serve and file a supplemental complaint. It is contended by the plaintiffs that the contracts resulting from these alleged fraudulent bids are void and could not be ratified by any act of the attorney general, the commissioner of highways, or the commission of administration and finance. It is further contended that even if the contracts were voidable only and not void,

the state in its complaint in intervention had made an election to avoid the contracts and could not thereafter make another election to treat them as valid but fraudulent.

On the part of the defendants it is contended that even if the allegations in the complaints are true the contracts are voidable, not void; that these plaintiffs as taxpayers are not entitled to maintain the action; and that the failure of the plaintiffs to make demand upon the attorney general to bring the action is fatal to their case. It is also contended that questions left open for consideration after the making of the stipulation should be submitted to arbitration in the manner provided by G. S. 1923 (1 Mason, 1927) § 2554(17).

G. S. 1923 (1 Mason, 1927) § 2554(6), provides that the highway department shall let construction contracts by competitive bidding. In case no satisfactory bids are received the statute authorizes rejection of all bids and a readvertisement or the doing of the work by employed labor. What was the effect of the alleged collusive bidding together with the stifling regulations and limitations of the highway department upon the validity of the contracts here under scrutiny? It could scarcely be expected that the highway department's regulations and limitations would result in fair competition among bidders. Limiting the number of bidders and restricting the amount of construction to be let to each during 1932 was scarcely less than an invitation to the favored contractors to get together and do just what it is alleged they did do—conspire to obtain the work at exorbitant profit. When the bids came in at a price alleged to be approximately 50 per cent above a reasonable price and nearly as much over previous contracts let under competition, it would seem that the most inexperienced of officials would have comprehended the situation. Assuming, as we do, on the part of the department no conscious knowledge of the bidders' collusion, the contrast was so great between the bids on the major projects and those on the more competitive minor project and the previous contracts that the failure of the department to comprehend the fraud being perpetrated was in our judgment so gross a mis-

apprehension of the situation as to amount to constructive participation in the fraud. If the allegations are true, it is difficult to see how anyone could possibly be so guileless or so artless as not to more than suspect what was going on. We therefore treat the situation alleged as one where there was not only conspiracy and collusion among the bidders but a constructive participation therein by the state officers whose duty it was to protect the public from the results of such a conspiracy. Even if a number of competent, responsible bidders had not been refused the opportunity to bid, we should still regard the contracts resulting from the alleged conspiracy as void as against public policy. These cases differ from the ordinary fraud case where the rights of individuals are involved. There the defrauded party has a right of election between remedies. We commonly regard such contracts as voidable, not void; but the law protects the public with greater safeguards and from public policy views contracts obtained as these are alleged to have been as wholly void.

In the case of Morgan v. Gove, 206 Cal. 627, 275 P. 415, 62 A. L. R. 219, a taxpayer successfully contended that collusive bidding rendered the resulting contract absolutely void. Cancelation and annulment followed.

In Fishburn v. City of Chicago, 171 Ill. 338, 340, 49 E. 532, 39 L. R. A. 482, 63 A. S. R. 236, it was said:

"It is a well settled general rule that all contracts in which the public are interested which tend to prevent competition, whenever a statute or well known rule of law requires competition, are void. City of Chicago v. Rumpff, 45 Ill. 90, 92 Am. Dec. 196; People ex rel. Peabody v. Chicago Gas Trust Co. 130 Ill. 268, 22 N. E. 798, 8 L. R. A. 497, 17 A. S. R. 319; Foss v. Cummings, 149 Ill. 353, 36 N. E. 553; 1 Addison, Contracts, p. 273; 2 Beach, Modern Law Contracts, § 1108."

In Oconto Elec. Co. v. Peoples L. & M. Co. 165 Wis. 467, 485, 161 N. W. 789, 795, a collusive contract was held "void from its inception." We regard this rule as the only safe one to follow where public interests are involved. Where competitive bids are required,

it appears to us that a collusive arrangement among all bidders as here alleged vitiates the letting as much as if there had been no call for bids. See also Diamond v. City of Mankato, 89 Minn. 48, 93 N. W. 911, 61 L. R. A. 448; Goodrich v. Northwestern Tel. Exch. Co. 161 Minn. 106, 201 N. W. 290.

It is contended that the plaintiffs as taxpayers have no special interest in the expenditure of highway funds and consequently have no cause of action. The plaintiffs allege that they pay automobile license fees and the state gasolene tax. We regard this as sufficient interest. It is true that they would pay these taxes anyway, but in our opinion they have a substantial interest in the honest expenditure of the funds into which their taxes are paid. White Eagle O. & R. Co. v. Gunderson, 48 S. D. 608, 205 N. W. 614, 43 A. L. R. 397; State ex rel. Chealander v. Morgan, 131 Wash. 145, 229 P. 309. Nor do we think it was necessary for them to demand the bringing of an action by the state officers. The participation in these contracts by the officers was alleged to be of such a character that prosecution of actions for their annulment could not reasonably be expected. The result has negatived any such expectation. The commissioner of highways and the engineer, as well as the commissioners of administration and finance, have answered, endeavoring to defeat the action. The attorney general has stippulated to the completion by the contractors of the work under these contracts at an expenditure of state funds over $150,000 in excess of what he has alleged to be a reasonable price. We do not think these contractors can take refuge behind any such defense. The statutes and their public duty constituted a standing demand upon these officials, and their actions and omissions a refusal. Mr. Justice Mitchell, speaking for this court in State ex rel. Currie v. Weld, 39 Minn. 426, 428, 40 N. W. 561, 562, holding that taxpayers had a right to bring an action to compel county officers to transfer county records to the county seat, said:

"It was not necessary for the relators to precede their application for a mandamus with a demand on respondents to move their offices to the county-seat. The law itself pointed out their whole

duty. It was purely a public duty, and there was no particular person upon whom devolved either the duty or the right to demand its performance. The statute was a standing demand, and the omission of the respondents to obey was a refusal. Com. v. Commissioners, 37 Pa. St. 237, 246; Attorney General v. Boston, 123 Mass. 460, 479; Cleveland v. Board of Finance, 38 N. J. Law, 259; Palmer v. Stacy, 44 Iowa, 340."

See also Burns v. Essling, 154 Minn. 304, 191 N. W. 899; Todd v. Rustad, 43 Minn. 500, 46 N. W. 73; Flynn v. Little Falls E. & W. Co. 74 Minn. 180, 185, 77 N. W. 38, 78 N. W. 106; Sinclair v. Bd. of Co. Commrs. of Winona County, 23 Minn. 404, 23 Am. R. 694.

Having arrived at these conclusions, it follows that the state officers could not elect to go on with the work and resort to an action for damages, nor could they in effect make a new contract agreeing to pay 80 per cent of the contract price. The original contract was void; it had "disappeared from the case." Fargo Foundry v. Callaway, 148 Minn. 273, 181 N. W. 584. The stipulation was unauthorized and void. The commissioners were without authority to make it. The attorney general certainly could not make such a contract in behalf of the state. According to his own allegations, it was a fraud on the state. Just as certainly there was no contract about which there could be an arbitration under § 2554.

The orders sustaining the demurrers to the plaintiffs' complaints are reversed. The orders overruling the demurrers to the complaints in intervention and refusing to strike out such complaints are affirmed. The orders disallowing the supplemental complaints are reversed. The plaintiffs may renew their motions to amend if so advised.

STONE, JUSTICE, took no part.

ON APPLICATION FOR REARGUMENT.

On February 24, 1933, the following opinion was filed:

PER CURIAM.

The defendant contractors have asked for a rehearing and have complained that the original opinion contains some statements of

fact which are alleged only in the proposed amended complaint. The original opinion contains a statement to the effect:

"The highway department adopted the same list of eligible contractors that the conspiring contractors had previously prepared. In conformance to the suggestion of the contractors, they were classified on the basis of the number of paving outfits which they might operate, each contractor being allowed 15 miles of pavement for each mixer or outfit."

It is true that the allegation that the department adopted the list at the suggestion of the eligible contractors is contained in the amended complaint and not in the original complaint, and our opinion is corrected accordingly.

In referring to paragraph 33 of the complaints, which alleges a prior letting of paving contracts to Nolan Bros., in the original opinion we used the plural instead of the singular in regard to such allegation. The singular should have been used, as but one contract is referred to. The original opinion is corrected also in this respect. The corrections do not change the result.

It is contended that the order disallowing the supplemental complaints of the taxpayers is not appealable. Although this question was not raised in the contractors' briefs, we carefully considered it before filing the original opinion and came to the conclusion that the matter alleged in the supplemental complaint in regard to the making of the stipulation by which the contractors were to be paid 80 per cent of the contract price was so vital to the merits of the taxpayers' cause of action and to the relief sought as to be appealable under the statute.

Other matters referred to in the petition are sufficiently disposed of in the original opinion.

Rehearing denied.