CITY OF SUPERIOR v. NORTON et al.[1]

(Circuit Court of Appeals, Seventh Circuit.   October 16, 1893.)

No. 107.

MUNICIPAL CORPORATIONS—EXECUTION OF CONTRACTS—CITY COMPTROLLER.

In that chapter of a city charter which defined the powers and duties of the city comptroller it was provided that he should "countersign all contracts made with the city, if the necessary funds shall have been provided to pay the liability that may be incurred against the city under such contracts, and no such contract shall be valid until so countersigned;" while the chapter defining the powers and duties of the board of public works declared that "all contracts shall be signed by the mayor and clerk, unless otherwise provided by resolution or ordinance, provided, however, that no contract shall be executed on the part of the city until the city comptroller shall have executed the same and made an indorsement thereon showing that sufficient funds are in the city treasury, or that provision has been made to pay the liability that may accrue under such contract." *Held,* that a contract of the city, imposing pecuniary obligation payable out of the revenue of the current year, not countersigned by the comptroller, was invalid, although the contract was made by another department of the city government than the board of public works.

Appeal from the Circuit Court of the United States for the Western District of Wisconsin.

Suit by Ann E. Norton and William F. Norton, Jr., against the city of Superior for specific performance.   Complainants obtained a decree.   Defendant appeals.

The appellees filed their bill in the court below to enforce the specific performance of a contract for the conveyance of certain real estate situated in the city of Superior. In 1890 the board of park commissioners of that city adopted a plan for a boulevard and park system for the city, extending from St. Louis bay on the west, easterly and northeasterly to the Bay of Superior, a distance of several miles. In the central portion of the system it was designed to have a large park. The lands of the appellees which form the subject of contention here were situated within the territory embraced by the system, and were desired to be acquired by the city authorities for the purposes of the proposed park. The city, under the authority of its charter, instituted proceedings for the condemnation of the lands by the exercise of the right of eminent domain. Pending these proceedings, the parties negotiated for the purchase of the lands by the city, which resulted in a contract dated December 16, 1890, between the board of park commissioners of the one part and the appellees of the other part, by which the premises were agreed to be sold to the city for the price of $33,083.50, payable upon the delivery of a good and valid warranty deed at any time on or before six months from that date, with interest at 7 per cent. per annum, which sum the city of Superior, by the board of park commissioners, agreed to pay. This contract was ratified and approved by resolution of the common council of the city on the 6th day of January, 1891.

The defendant interposed three pleas to the bill, in substance as follows: First. That previous to the contract the common council had not provided the money or funds to discharge the liability created by it, and that there was no money in the treasury at the time of the execution of the contract, nor at the time when the deeds were to be delivered, available to pay the liability and indebtedness thereby incurred; and that the common council did not, by the resolution approving the contract or otherwise, provide for the collection of a direct annual tax sufficient to pay the principal and interest of the

[1] Rehearing pending.

indebtedness as it fell due, and whereby, as it was alleged, said contract was illegal and void, and in violation of section 3 of article 11 of the constitution of the state of Wisconsin. The second plea states the same facts alleged in the first plea, with the additional allegation that by reason of the failure of the common council to make provision for the payment of the indebtedness stated in the contract it was incompetent and illegal for the comptroller of the city to countersign the contract, or to countersign any order drawn on the treasury to liquidate the indebtedness therein stated; and that the contract was not countersigned by the comptroller, and was therefore illegal and void. The third plea sets forth the provisions of the ordinances of the city creating and defining the powers and duties of the park commissioners; that thereunder it was their duty to file with the city clerk of the city, on or before the 1st of November in each year, a detailed statement of the amount of money that would, in their judgment, be needed during the ensuing year for the acquisition of parks; that it became the duty of the city clerk thereupon to place such estimate before the common council for its guidance in making the annual levy for taxes; that the park commissioners did not make or file any such estimate, and that no estimate for the purpose of acquiring lands for the park was made or placed before the said common council, or was before it or considered by it previous to the alleged contract, or at any time thereafter; and that during the month of November, 1890, there were no moneys or funds of any kind in the park fund of the city, and no money or funds in the general fund of the city, but that, on the contrary, there was a deficit in the general fund, and that such park fund and such general fund were the only funds from which the city could have legally drawn for money to pay for park lands in accordance with the provisions of the city charter. These pleas were severally overruled by the court, and the defendant ordered to plead to the merits, and, failing therein, the bill was taken pro confesso, and a decree entered against the city that upon the tender and delivery to it of a conveyance for the land it should pay to the complainant the sum of $38,203.43, the purchase money of the premises, with interest, and that the complainants have execution therefor.

A. C. Burnett and P. H. Perkins, for appellant.

A. L. Sanborn (William F. Vilas, of counsel), for appellees.

Before WOODS and JENKINS, Circuit Judges, and SEAMAN, District Judge.

JENKINS, Circuit Judge (after stating the facts). The contention of the appellees that the pleas interposed by the defendant below (appellant here) are not before us for review is not well founded. The pleas were set down for argument by the appellees. They thereby confessed the facts stated, and submitted to the court the question of their sufficiency in law. Farley v. Kittson, 120 U. S. 303, 7 Sup. Ct. 534. But the pleas are not out of the case, because they were overruled. The appellant did not waive its right to stand upon the pleas by submitting to a decree pro confesso. This appeal authorizes a review of the ruling below upon the question whether the facts stated in the pleas, or in any of them, are availing to defeat a recovery upon, or the enforcement of, the contract set forth in the bill.

We will first consider the second plea, which goes to the question of the validity of the contract because it was not countersigned by the city comptroller. The question is dependent wholly upon the provisions of the charter of the city. We must look to that charter for the authority of the city to contract, and the mode in which that authority is to be exercised. The charter is

the source of power. It was said by Chief Justice Marshall in Head v. Insurance Co., 2 Cranch, 127, 169:

"The act of incorporation is to them an enabling act. It gives them all the power they possess. It enables them to contract; and when it prescribed to them a mode of contracting, they must observe that mode, or the instrument no more creates a contract than if the body had never been incorporated." Approved, Merrill v. Monticello, 138 U. S. 673, 687, 11 Sup. Ct. 441.

In construing charters of municipal corporations it is the policy of the law to require of such corporations a strict observance of their power. "Any ambiguity or doubt arising out of the terms used by the legislature must be resolved in favor of the public." Minturn v. Larue, 23 How. 435, 436; The Binghamton Bridge, 3 Wall. 51, 75; Stein v. Water-Supply Co., 141 U. S. 67, 79, 11 Sup. Ct. 892. And see, also, Hamilton Gas Light & Coke Co. v. Hamilton City. 146 U. S. 258, 268, 13 Sup. Ct. 90. And while powers expressly granted or necessarily implied are not to be defeated or impaired by any overstrict construction, yet a power cannot be upheld unless it be clearly comprehended within the language of the act, or derived therefrom by necessary implication; and the restriction imposed by the charter upon the exercise of the power granted must be upheld in the interest of the public. So that every one dealing with a municipal corporation is bound at his peril to know the extent of its powers, and the manner provided for their execution.

We proceed, therefore, to the inquiry whether by the terms of the enabling act it was requisite to the validity of the contract by the city of Superior that it should be countersigned by its comptroller. The charter of the city is to be found in chapter 152 of volume 2 of the Laws of Wisconsin for the year 1889, published March 25, 1889. In chapter 5 of the act defining the powers and duties of the city comptroller we find the following provision, in section 27 of that chapter:

"He shall countersign all contracts made with the city if the necessary funds shall have been provided to pay the liability that may be incurred against the city under such contract, and no such contract shall be valid until so countersigned."

In chapter 10 of the act defining the powers and duties of the board of public works (section 71) occurs the following provision:

"All contracts shall be signed by the mayor and clerk unless otherwise provided by resolution or ordinance. Provided, however, that no contract shall be executed on the part of the city until the city comptroller shall have executed the same and made an endorsement thereon showing that sufficient funds are in the city treasury, or that provision has been made to pay the liability that may accrue under such contract."

Standing alone, and construed without reference to other legislation, the language of the provisions would seem to be plain and unambiguous, and not open to doubt. By a familiar rule of construction, the latter provision, being embodied in the chapter entitled "The Board of Public Works," has reference only to those contracts of which the board of public works had cognizance and control. The former provision is found in the chapter defining

the duties of the officers of the city, is comprehensive in its terms, and upon the face of it manifestly includes all contracts made by the city which entail upon the corporation a pecuniary liability. This view—which to us seems clear by the very language of the provision—is fortified by the manifest design of the legislature, apparent in all the provisions of the act, to inhibit the corporation from entering into any contract imposing pecuniary liability upon the city, unless and until the common council has provided the neces- sary means for the liquidation of such liability. The legislature sought to impose upon this municipal corporation a restriction with reference to the incurring of liability payable out of the in- come of the current year, similar to that imposed by the constitu- tion of the state by amendment to section 3, art. 11, adopted Novem- ber 3, 1874, upon municipal corporations with respect to their bonded indebtedness, which was that before or at the time of the incurring of such indebtedness the corporation should provide for the collection of a direct annual tax sufficient to pay the interest as it matures, and a sinking fund to discharge the principal when it should fall due. The charter evinces a consistent, harmonious, single spirit and policy governing and regulating the action of this municipal corporation, as in fact exists as to all municipal corpora- tions of the state created under the general charter of cities, that in respect of all contracts whereby pecuniary liability is incurred, provision for payment should be made at or before the time of the execution of the contract. The considerations which led to the adoption of this policy are apparent in the history of the state prior to the adoption of the constitutional amendment. Municipal corporations had issued bonds without respect to the value of the taxable property within the limits of the corporation, and without provision for payment of the interest or principal of the bonds at maturity. Indebtedness for municipal improvements within the limits had been incurred without regard to the sufficiency of the revenue of the current year to meet the indebtedness, and without respect to the extent of the burden cast upon the taxpayer. The practice had become a scandalous evil. In many instances bank- ruptcy had resulted; the public debt of many corporations was compromised, and in one or two instances, where the load of indebtedness seemed too great to be met, or there was inability to compromise, repudiation was resorted to, to avoid the payment of just obligations. It was to prevent in the future this unwhole- some state of affairs that the policy was adopted by constitutional amendment as to bonded indebtedness, and by statute as to indebt- edness payable out of the revenue of the current year, that provision should be made for payment at or before the time of the incurring of the liability. The people of the state and their representatives in the legislature sought thus to avoid reckless extravagance, and the repudiation of just obligations. We find, therefore, throughout this act, the manifest design that there should be prior provision for the payment of every obligation incurred, and restrictive measures to insure such provision. The comptroller is named as the censor of the common council and of the several departments of the city

government. He is required, in anticipation of the annual tax levy by the common council, to lay before them a detailed statement of the expenses during the past, and an estimate of the expenses for the ensuing, fiscal year, and the income of the city for that year from sources other than taxation, so that the common council may have the necessary information to provide adequately for the pecuniary necessities of the city during the coming year. He is also to report monthly the condition of the several funds of the city and of all outstanding contracts and claims which may be payable out of each fund. He shall examine and countersign all city orders issued for the payment of obligations of the city before the same shall be valid. He shall not countersign such orders before the money is in the treasury to pay the same. Section 27.

We find further illustration and confirmation of this view in the provisions of chapter 15, treating of eminent domain. The common council of the city is authorized by section 165 to establish a board of park commissioners, and to prescribe their powers; and by section 167 is granted full power to legislate with reference to public parks, provided, however, that no park should be established at the expense of the city unless the proposition was first submitted to the vote of the electors at an annual city election, and adopted by a majority vote in its favor. By chapter 6, § 34, subd. 29, the common council is empowered to acquire by gift, grant, devise, donation, purchase, or condemnation lands for public parks, and by section 103, c. 13, the common council is vested with authority to issue bonds for the acquiring of public parks, subject to the constitutional provision that the amount thereof, together with all other indebtedness of the city, less sinking funds on hand, shall not exceed 5 per cent. of the assessed valuation of the city at the previous assessment. The city may also, under chapter 15, institute proceedings in court for the condemnation of lands necessary to be taken for a public park, or for other public use. Section 133 provides that within three months after any judgment of condemnation the common council shall cause an assessment of damages and of benefits to be made chargeable upon the property supposed to be benefited thereby. Such assessment is to be confirmed by the common council, or that body may by resolution abandon the condemnation proceedings. In case of neglect for three months to order such assessment of benefits and damages, or to confirm such an assessment, and make provision for paying the excess of damages over benefits within one year after the entry of judgment of condemnation. the condemnation proceedings shall be deemed to have been abandoned. Section 128 of that chapter provides that if the city shall not, within one year after the entry of a judgment of condemnation, cause the benefits and damages by reason of such condemnation to be assessed, and shall not have in the proper fund available for that purpose sufficient to pay the excess of damages over benefits, the condemnation proceedings shall be deemed to have been abandoned. The comptroller is required at the expiration of the year to furnish, upon demand, to the mayor or other proper officer of the city, a certificate showing whether

there was at the end of such year in any fund of the city available for that purpose a sum sufficient to pay such excess of damages over benefits. If it shall appear that there is in any fund a sufficient sum available for that purpose, then the city may take possession of the land condemned, and an order may issue for payment to the persons entitled thereto.

The ordinance defining the powers and duties of the park commissioners (section 195, Principal Ordinances) otherwise designated as "City Ordinance No. 39, § 3," provides that on or before the 1st day of November in each year the board of park commissioners shall file with the city clerk a detailed statement of the amount of money which will in their judgment be needed during the ensuing year for the acquisition, care, and improvement of parks; and this estimate the city clerk shall place before the common council at the time the common council shall receive the estimates of city officers as required by section 110 of the city charter, so that the common council may be guided thereby in making the annual levy of taxes. Section 110, therein referred to, requires estimates by the board of public works and board of education of the amount of money necessary for the ensuing fiscal year in their respective departments; by the city comptroller the statement of the several amounts required by the police department, fire department, and general fund, and for purpose of paying interest for the ensuing year on the public debt and 5 per cent. of the principal thereof. Thus it will be seen that full provision is made by law for the ascertainment in advance of all payments necessary to be made by the city during the ensuing fiscal year, and for the levy of taxes for payment thereof, and the design is apparent that no monetary obligation shall be incurred not so provided for; and as a further restriction upon the incurring of indebtedness the charter provides that all contracts involving pecuniary liability made by the city shall be invalid unless countersigned by the city comptroller. We observe nothing on the face of this statute which restricts the language to contracts of any particular department of the city government, or, as is claimed, to contracts made by the board of public works. The fact that we find in the charter treating of the board of public works an express provision prohibiting the execution of such contracts by the mayor and clerk until the city comptroller shall have certified thereon that sufficient funds are in the treasury, or that provision has been made to pay the liability that may accrue, does not restrict the language of the general provision that all contracts of the city shall be void unless countersigned by the comptroller. It is contended that the term "such contracts," used in the section defining the duties of the city comptroller, refers to the contracts of the board of public works. We conceive this contention to be unfounded. The term manifestly refers to the contracts previously mentioned, namely, such contracts as entail pecuniary responsibility upon the city; and we think it would be a strained construction of the statute otherwise to limit it. The term "all contracts" is comprehensive, and is not to be limited unless used in a connection which clearly shows that such limitation

was intended. It is not so used here, but is found stated in a general provision touching the powers and duties of the city comptroller with respect to all financial affairs of the city. Lord Coke said (Bonham's Case, 8 Coke, 117): "The best expositor of an act of parliament in all cases is acts of parliament themselves." We should be doing violence to the language employed to restrict the provision to contracts entered into by the board of public works.

This conclusion is further fortified by reference to chapter 124 of the Laws of 1891, being "An act to revise, consolidate and amend chapter 152 of the Laws of 1889, entitled 'An act to incorporate the city of Superior.'" The legislature, in section 27 of that act, treating of the powers and duties of the comptroller, provides as follows: "He shall examine and countersign all general and improvement bonds." There would seem to have been some question whether the original charter required the comptroller to execute such bonds, the improvement bonds being supposed by some to impose no liability upon the city, but to be chargeable only upon the property of individual taxpayers,—a claim subsequently proven unfounded (Fowler v. City of Superior, 85 Wis. 411, 54 N. W. 800), or to refer to bonds of the city payable at the expiration of a term of years. To make the matter certain, this provision was made by way of amendment, thus emphasizing our conclusion that all contracts of every kind involving pecuniary liability upon the city of Superior were designed and intended to be countersigned by the comptroller; otherwise this anomaly would result: that countersigning is essential with respect to the bonded indebtedness and with respect to the obligations contracted through the board of public works, and not necessary with respect to contracts made by the board of park commissioners or by the common council. This would be in derogation of the general spirit and policy of the law and of the manifest design of the legislature to restrict the power to contract when no provision had been made for the payment of the liability incurred, and in enforcement of such restriction to require as a condition to the validity of such contract that it be countersigned by the comptroller. In an able and ingenious argument, the construction contended for is sought to be enforced by construing this provision of the charter in the light of chapter 326 of the Laws of Wisconsin for the year 1889, approved April 8 and published April 12, 1889, being "An act dividing cities into classes, and providing for their incorporation and government." It is claimed that this act, though passed subsequently, formed a model for the charter of the city of Superior; and it is properly insisted that under a familiar principle of construction weight should be given to the construction which the legislature passing the same has put thereon, either in other parts of the same act or in other acts relating to the same subject-matter. Milwaukee Co. v. Ehlers, 45 Wis. 281, 295. It becomes necessary, therefore, to inquire whether, in the light of that act, the provisions of the act in question should receive a different construction from that which is required by the language of the act, and should be limited to contracts made by the department of public works. This general

charter of cities (chapter 326) by its terms does not affect any city then incorporated, unless it be adopted in the manner therein provided, and does not apply to the city of Superior. It is, however, properly invoked by counsel for consideration as an act in pari materia for the purposes of interpretation. A careful comparison of the two acts leaves no room for question that the charter of the city of Superior, although prior in passage and publication, was in fact almost literally, and with Chinese fidelity, largely copied from that part of the general charter of cities referring to cities of the second class. It is part of the history of the state that this chapter 326 was prepared by a commission appointed by the legislature of 1887, and reported to and adopted by the legislature of 1889. The act divided the cities of the state, or those which should adopt the provisions of the act, into three classes: First, those containing a population of 40,000 or over; second, those containing a population of 10,000 and over and under 40,000; third, those containing a population of 2,000 and over and under 10,000. The act provides, as to cities of the first and second class, for a comptroller and a board of public works. In cities of the first class the comptroller is not a member of that board. In cities of the second class he is a member ex officio. The charter of the city of Superior embraces those provisions of the general charter touching cities of the second class. With respect to the duties of a comptroller in cities of the first class, the act (section 44) provides:

"He shall examine all estimates of public work to be done made by the board of public works and all contracts made by them, and shall countersign the same if they are legal and if the necessary funds shall have been provided for the proposed work, and no contract shall be valid unless so countersigned."

The act provides in respect to the duties of comptrollers of cities of the second class (section 45):

"He shall countersign all contracts made with the city if the necessary funds shall have been provided to pay the liabilities that may have been incurred against the city under such contract, and no such contract shall be valid unless so countersigned."

In the chapter treating of the board of public works (chapter 11, § 93) it is provided as follows:

"All contracts shall be signed by the mayor and clerk unless otherwise provided by resolution or ordinance. Provided, however, that no contract shall be executed on the part of the city until the city comptroller shall have countersigned the same and made an endorsement thereon showing that sufficient funds are in the city treasury, or that provision has been made to pay the liability that would accrue under such contract."

It will be observed that the two provisions last quoted are identical with the provisions in section 27 and section 71, respectively, of the charter of the city of Superior. It is insisted that, as the same reasons and necessity supposedly existed to require the comptroller of cities of whichever class to countersign all contracts made by a city, and as the provision in respect of cities of the first class requires the comptroller to countersign only those contracts made by the board of public works, that the provision

in respect to cities of the second class that "no such contract shall be valid unless so countersigned" refers necessarily to the same class of contracts mentioned in the provision with respect to cities of the first class, and that such construction should be applied under the circumstances to the provision of the charter of the city of Superior. We cannot give such construction to these provisions without a straining and contortion of the language of the two provisions that would be without warrant or justification. The language of the two provisions is quite different. In cities of the first class the comptroller shall examine all estimates of work to be done made by the board of public works, and all contracts made by them. This provision is wanting in respect of cities of the second class, because, it is insisted, in the latter class the comptroller is a member of the board of public works, while in the former he is not. In the former case the language is, "He shall countersign the same if they are legal." This language is wanting in the provision respecting cities of the second class. "And if the necessary funds shall have been provided for the proposed work, and no contract shall be valid unless so countersigned." This clearly limits the provision to the contracts of the board of public works. But in case of cities of the second class the comptroller is to countersign "all contracts made with the city if the necessary funds shall have been provided to pay the liabilities that may have been incurred against the city under such contracts, and no such contract shall be valid unless so countersigned." The language here is broader and more comprehensive than in the former provision. The term "no such contract" has reference to and comprehends contracts which shall entail a liability upon the city, whether made by the board of public works or otherwise. We do not understand why the legislature made this distinction in respect to the duties of the comptroller in cities of the first class and in cities of the second class; why it required in the one case that all contracts should be countersigned, and in the other that only contracts made by the board of public works should be countersigned. But it is not our duty, because we cannot perceive the reason, to say that the legislature had no reason. The power was lodged with the legislature to make the distinction, and it is not within our province to give to the language employed a restricted meaning in the case of cities of the second class because the legislature failed to give the same power and impose the same restriction upon its exercise in the case of cities of the first class. We have no more right to restrict the language in the one case than we have to enlarge the scope and meaning of the language employed in the other case. We can only say, "Ita scripta est," and give to the language employed its natural meaning.

We are constrained to the conclusion that the provisions of the charter require that all contracts involving the outlay of money made by the city must be countersigned by its comptroller, and that, therefore, failing such countersigning, the contract in question was void. It is clear to us that the provisions of the law are explicit, and are not to be set aside by construction. If the con-

demnation proceedings had proceeded to judgment, the appellees would have been in no better plight than they are now. There had been no provision made for payment of the amount that might have been awarded as the value of their land, and there was no compulsion of law so to provide. The proceedings, therefore, by the very terms of the charter, would have fallen to the ground. Contracting with a municipal corporation, they were bound to know the extent of the powers granted, and the mode in which they should be exercised. They retain their land, and have lost nothing, unless it be in failing to receive a price which the city authorities unlawfully contracted that the city should pay. The conclusion to which we have arrived renders it unnecessary to consider the questions presented by the other pleas. The judgment will be reversed, and the cause remanded, with instructions to sustain the second plea and to dismiss the bill.