MILWAUKEE ELECTRIC RAILWAY & LIGHT COMPANY, Respondent, vs. CITY OF MILWAUKEE, Appellant.

*January 13—February 8, 1921.*

*Electricity: Ordinance requiring free electricity for city: Validity: Effect of public utilities act: Estoppel: Constitutional law: Debt incurred by municipality: Provision for retirement: Depreciation: Milwaukee city charter: Contracts of city: Validity.*

1. An ordinance of the city of Milwaukee passed in the year 1890, permitting electric companies previously prohibited from consolidating by ordinances purporting to grant franchises to them, to consolidate in consideration that the consolidated company furnish electricity for certain purposes to the city free of charge, is void, the permit to consolidate being no consideration for the agreement to furnish free current, in view of the invalidity of the prior ordinances attempting to prevent the consolidation of the companies, such regulations being beyond the city's police power and the city having no power to stipulate for free service.

2. Sec. 1797m—89, Stats., has been construed to amend franchises of existing utilities and to supersede them when the utility secures an indeterminate permit under sec. 1797t—3; and a contract by an electric company to furnish free electricity to the city is likewise superseded when the company began to operate under an indeterminate permit. *Oshkosh v. Eastern Wis. E. Co.* 172 Wis. 85, distinguished.

3. Such contract was not validated by sec. 1797m—87, empowering cities to prescribe conditions upon which a public utility may be permitted to occupy the streets not inconsistent with the provisions of the public utility act—a contract to give the city free electricity being inconsistent with such act.

4. The electric company's contract to furnish the city electricity free of charge, invalid because not made by the city in its proprietary capacity and because not supported by a consideration, was not validated by the enactment of the public

utility act (sec. 1797m—91, Stats.), providing that the charging of rates provided for in an existing contract executed prior to April 1, 1907, shall not constitute a discrimination. *Superior v. Douglas Co. Tel. Co.* 141 Wis. 363, distinguished.

5. The acceptance by the electric company of an ordinance requiring it to furnish electricity to the city free of charge did not preclude the company, while operating under an indeterminate permit, from claiming that the ordinance was *ultra vires,* since, having become subject to the restrictions of the indeterminate permit, the company became entitled to its benefits.

6. Sec. 3, art. XI, Const., requiring a municipal corporation incurring any indebtedness to provide for the collection of a direct annual tax sufficient to pay interest as it falls due and to pay the principal within twenty years, is inapplicable to a city's contract with an electric company requiring the company to operate and maintain a park electric lighting system, terminable after two years by the city's acquisition of title to the plant, upon payment to the company of the difference between the special investment in the park lighting system and the accumulated depreciation reserve provided for at the date of termination, in the absence of proof that the depreciation reserve exceeded its legitimate limits and the charge therefor was so excessive as to constitute a payment upon capital.

7. A charge for depreciation is a necessary and proper element of the cost of each year's service and is in the nature of an expense of operation, and provision should be made therefor out of earnings.

8. Sec. 16, ch. V, and sec. 16, ch. VIa, of the Milwaukee charter, requiring the city to submit contracts for the purchase of "supplies or material" to competitive bidding, are inapplicable to a contract for electricity to light a city park by equipment to be installed by the electric company, giving the city the option, on expiration of a specified period, to terminate the contract and purchase the plant.

9. Sec. 13, ch. V, of the Milwaukee charter, requiring contracts entered into by the commissioner of public works to be countersigned by the comptroller and to be examined and approved by the city attorney; sec. 16, ch. VIa, giving the board of park commissioners the same powers and authority as to parks previously possessed by the common council and the board of public works; and sec. 13, ch. III, requiring the comptroller to countersign all contracts made in behalf of the city, did not require the park board's contract for the electricity to light a city park to be countersigned by the comptroller and approved by the city attorney, in view of the legislative history of such charter provisions and of the nature of the comp-

Milwaukee E. R. & L. Co. v. Milwaukee, 173 Wis. 329.

troller's duties under secs. 12–17, ch. III, and secs. 13–15, 18, 19, ch. V, and the general nature of the duties and authority of the park board, under secs. 16, 18, 18a, 20–22, ch. VIa.

APPEAL from a judgment of the circuit court for Milwaukee county: CHESTER A. FOWLER, Judge. *Affirmed.*

Two causes of action to recover for electric service furnished to the city of *Milwaukee,* or certain of its boards and departments, at rates of charge alleged to have been established therefor by the railroad commission of Wisconsin. Plaintiff company had judgment on both causes of action in the trial court, and defendant city brings this appeal from the whole of the judgment. The appeal is presented on the pleadings and the decision of the trial court without a bill of exceptions.

### First cause of action.

The first cause of action is to recover for electrical energy furnished for the operation of four of the city's drawbridges. None of these particular bridges was occupied by any of the property of the respondent company, yet it has been paid nothing for the service. This came about in the following way:

On the 21st of November, 1885, the *Milwaukee* common council passed an ordinance purporting to grant to the Badger Illuminating Company the right to maintain lines in the city's streets for furnishing electric current, and providing that the said company should not pool or assign its interests nor consolidate with any other electric light company which might thereafter obtain a "franchise" to do business in the city, and providing that upon pooling or consolidating without consent of the council the ordinance should be void. On October 7, 1889, a similar ordinance was passed for the Edison Electric Illuminating Company prohibiting consolidation and the like with any other company which might theretofore or thereafter have obtained a "franchise."

On December 1, 1890, the council passed an ordinance purporting to amend the two prior ordinances so as not to prohibit the consolidation of the two companies, upon condition that the consolidated company, furnish the power necessary to turn certain named bridges, including the four bridges here involved, free of charge to the city, and providing that if the consolidated companies should fail to furnish such power it should be considered a forfeiture of all their "franchises."

The two companies were consolidated, and respondent company thereafter became the owner of whatever rights the companies had by reason of these ordinances and has furnished the service required.

The railroad commission established a schedule of rates for electric power service furnished by respondent company in *Milwaukee* which was effective during the period from December 1, 1912, to the time of bringing this action, and the action is to recover at these rates for the service rendered during this period, it being claimed by respondent company that the agreement to furnish the service free of charge was void in its inception, and that in any case it was relieved of the obligation by the passage of the "public utility" act and the "indeterminate permit" act and proceedings had thereunder.

The trial judge found the facts substantially as here summarized. He concluded that the rate fixed by the railroad commission was applicable to this service and that the respondent was entitled to recover.

### Second cause of action.

The second cause of action is to recover for a balance claimed to be due and unpaid upon one month's charge for electric lighting in Lake Park in the city of *Milwaukee*.

On August 3, 1916, respondent company entered into a written contract with the board of park commissioners of the city for the installation and operation of an electric lighting system in the park. The contract purported to be

executed by the board acting for the city. By it the company agreed to install the system, furnish the current, and otherwise operate and maintain the system. The arrangement was to continue for an indeterminate period, terminable after two years upon six months' notice by the board. The rates of charge for the first year were fixed to cover three groups of costs, group "A" covering such costs as were incurred jointly by the park lighting and other public service, and groups "B" and "C" covering such costs as were incurred by the special facilities for the park lighting. It was provided that the charges should be subject to adjustment in consequence of change in any of the groups of costs; that group "A" should be subject to review under the public utility act, and that groups "B" and "C" should be revised annually according to the investment in the special equipment installed and the cost experience in operating it, respectively. Among the costs in group "B" was a charge of four per cent. per year upon the special investment for park lighting to "insure replacement (depreciation reserve)," to which reserve interest was to be credited semi-annually at the rate of four per cent. upon the accumulated reserve and from which the cost of special investment retired from the service was to be deducted from time to time. The sum of the "A" costs as revised from time to time under the utility act, and the "B" and "C" costs as revised annually, was to constitute the price payable in equal monthly instalments during each contract year. It was further provided that upon the termination of the agreement at the election of the park board, as therein provided, it would pay to the company the difference between the special investment in park-lighting equipment and the accumulated depreciation reserve at the date of termination, and that the title to the special equipment should thereupon be acquired by the board.

The agreement was entered into without calling for bids and was executed by the park board without being

countersigned by the comptroller or approved by the city attorney as to form and execution.

A lighting system was constructed and during October, 1918, was operated by current furnished in accordance with this agreement, and the service was accepted and received by appellant city.

On September 14, 1918, the railroad commission entered an order increasing the rates for park lighting by adding a surcharge to the group "A" of costs mentioned, and this cause of action is to recover the difference between the amount paid and the full charge as thus increased for the month of October, 1918, the first month in which the increase was operative. In refusing to pay this amount the city contends that the contract of August 3, 1916, is invalid.

The trial court concluded that the rates fixed in the contract of 1916 as modified by the order of the railroad commission were the lawful rate of charge for the park-lighting service, that the utility act forbade furnishing or receiving the service at any other rate, and that regardless of the validity of the contract, a matter not decided by him, the respondent was entitled to recover the *quantum meruit* at the rate fixed by the commission.

For the appellant there was a brief by *Clifton Williams,* city attorney, and *Walter J. Mattison,* assistant city attorney, and oral argument by *Mr. Mattison.*

For the respondent there was a brief by *Van Dyke, Shaw, Muskat & Van Dyke* of Milwaukee, and oral argument by *James D. Shaw.*

JONES, J. In these two causes of action counsel on both sides attack agreements between the city and the electric company as invalid and unconstitutional. In the first cause of action counsel for the company allege that certain portions of the ordinances involved were wholly unauthorized. Counsel for the city argue that even if this were true the company is estopped from raising the question. In the

second cause of action counsel for the city allege that the contract was wholly void, and counsel for the company reply that the city is in no situation to make such a claim. It might not be easy to reconcile these apparent inconsistencies, but neither lawyers nor statesmen are held to any very rigid rule of consistency; even the courts have been known to depart from it.

Although the validity of portions of the ordinances set forth in the statement of facts was ably and elaborately discussed by counsel on both sides it was not passed upon by the trial judge, and on account of the view we take of another branch of the case it does not seem necessary to indulge in as full discussion of the ordinances involved as might otherwise be necessary.

Counsel on both sides are agreed that the ordinances of 1885, 1889, and 1890 were not franchises but were mere licenses, and that there was then no statutory authority in cities to grant franchises to electric companies. Ch. 192, Lawe 1893 (sec. 1780b, Stats. 1898), did give authority to such companies, "with the consent of, and in the manner agreed upon with the authorities of any city or village," to use the streets; and the provisions of the statute were made to apply to any corporation theretofore organized and then operating its plant by consent of the municipality.

In the case of *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 130 N. W. 530, this statute was construed. Subject to the statute an ordinance called a franchise was given to an electric company requiring it to pay into the treasury of the city two per cent. of its gross earnings in addition to such other taxes as were provided by law. It was held that the language of the statute contemplated no more than police regulations and that the requirement objected to was void. In *State ex rel. Wis. Tel. Co. v. Sheboygan,* 111 Wis. 23, 86 N. W. 657, the city claimed the right, in granting a so-called franchise, to impose various conditions, such as that the city might fix rates of charges, that the company

must consent to sell its privileges at an appraised value, consent to the free use by the city of a part or all of its poles, and consent to other uses of the property by the city. This court held that the company derived its powers directly from the state, that no power was given to the city to fix rates, nor to exact the right to buy the exchange, nor to use the poles of the company, nor to control competition. Although the decision recognized the right of reasonable regulation by the city, it was held that these conditions attempted to be imposed were not within the purview of police regulations. In the case of *Kenosha v. Kenosha Home Tel. Co.* 149 Wis. 338, 135 N. W. 848, it was held that an ordinance purporting to grant to the telephone company the right to operate a general telephone system in the city was void; that the only franchise needed by the company was the franchise conferred by the statute; that the provision in the ordinance that the company should furnish to the city free telephone service was not a contract; and that the city could not barter the exercise of its police power for free telephones. See, also, *Wis. Tel. Co. v. Milwaukee,* 126 Wis. 1, 104 N. W. 1009; *State ex rel. Smythe v. Milwaukee Ind. Tel. Co.* 133 Wis. 588, 114 N. W. 108, 315.

It follows from the cases above cited that the city of *Milwaukee* had no power to grant a franchise to the company when any of the ordinances involved were enacted; that the provisions in the ordinances of 1885 and 1889 attempting to prevent the consolidation of the companies were beyond the police powers of the municipality and invalid; that the amendment of these ordinances by that of 1890 furnished no consideration for an agreement to furnish free current; and that the city had no power to stipulate for free service in its amended ordinance of consent.

It is claimed by counsel for the company that even if there had been a valid agreement to furnish free current it would be superseded by the public utility act. The company has been operating under an indeterminate permit since

July, 1911. Sec. 1797*m*—89, Stats., has been repeatedly construed by this court to amend the franchises of existing utilities and to supersede them under circumstances analogous to those of the instant case. *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 129 N. W. 925; *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 130 N. W. 530; *Calumet S. Co. v. Chilton,* 148 Wis. 334, 135 N. W. 131; *Kilbourn City v. Southern Wis. P. Co.* 149 Wis. 168, 135 N. W. 499; *Kenosha v. Kenosha Home Tel. Co.* 149 Wis. 338, 135 N. W. 848.

Counsel for the city greatly rely on a recent case to maintain their claim that the agreement to furnish free current has not been superseded by the public utility statute. *Oshkosh v. Eastern Wis. E. Co.* 172 Wis. 85, 178 N. W. 308. In that case the city of Oshkosh granted to a street railway company a franchise to extend its interurban electric railroad from the city of Fond du Lac into the city of Oshkosh. There was a provision in the ordinance by which the company was to pay the city $35,000 in annual payments of $1,000 each. The ordinance was duly accepted. The complaint alleged that the consideration for the payments was partial compensation for the wear and tear of bridges and streets resulting from the operation of the interurban cars. After *surrendering* its franchise the company claimed that this agreement had been superseded and that it was no longer bound to make the payments. When the franchise was granted and accepted, the statute, sec. 1863, provided that the consent of the common council should be given by ordinance and upon such terms and subject to such rules and regulations and the payment of such license fees as the common council might from time to time prescribe. The distinction between the *Oshkosh Case* and the present case seems to us very plain. In the former case there was a *franchise* duly authorized by statute, and it was held that an agreement to pay the compensation stated for the use and wear and tear of the streets and bridges was not superseded

by the indeterminate permit under sec. 1797*t*—3, Stats. The decision expressly recognized the binding effect of the *La Crosse Case* above cited, and pointed out the difference between the statute under which the La Crosse company was organized and the street railway statute. The opinion in the *Oshkosh Case* is based on former decisions of the court, including *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 129 N. W. 925. In the latter case the opinion by Mr. Justice BARNES, while discussing a statute authorizing the railroad commission to fix rates, held that when the commission acted to fix rates, if the rates should be changed by their order a former contract would be superseded.

It is our conclusion that the *Oshkosh Case* does not support the contention of appellant's counsel and that it does not modify the rule settled by such cases as the *La Crosse Case;* *Calumet S. Co. v. Chilton,* 148 Wis. 334, 135 N. W. 131; and *Kenosha v. Kenosha Home Tel. Co.* 149 Wis. 338, 135, N. W. 848.

Sec. 1797*m*—87, Stats., provides that cities shall have power to determine by contract, ordinance, or otherwise all terms and conditions, not inconsistent with secs. 1797*m*—1 to 1797*m*—109, inclusive, upon which such public utility may be permitted to occupy the streets. The section also provides for hearings by the commission as to the validity of such contracts or ordinances. Counsel for the city urge that under these provisions the common council could even now insert clauses in a franchise providing for free service, and that the company's mode of relief was to appeal to the railroad commission. We have already held that the contract contained in the ordinance of 1890 was invalid. It was not made valid by the section referred to. Moreover, it seems clear to us that a contract giving free service to a city is inconsistent with the provisions of the public utility act and therefore not protected by the section in question. The reasons for this have been so fully stated in *Kilbourn City v. Southern Wis. P. Co.* 149 Wis. 168, 180, 135 N. W.

499, the *La Crosse Case,* and the *Calumet Case* that they need not be repeated.

Counsel for the city also rely on sec. 1797*m*—91, which provides as follows:

". . . The furnishing by any public utility, of any product or service at the rates and upon the terms and conditions provided for in any existing contract executed prior to April 1, 1907, shall not constitute a discrimination within the meaning specified."

They claim that this section saves contracts executed prior to the passage of the utility act April 1, 1907, and cite *Superior v. Douglas Co. Tel. Co.* 141 Wis. 363, 122 N. W. 1023. The same question was raised in the *Kenosha Case,* above cited, in which the following language was used by Mr. Justice VINJE:

"That was a case where the city of Superior in its proprietary character entered into a contract for free telephones with an existing telephone company operating under a charter from the state. No attempt was made by the city to confer any franchise, or right to operate any telephone system, upon the telephone company. The city and the telephone company, prior to the passage of ch. 499, Laws 1907, entered into a contract—not a part of any franchise granted or attempted to be granted—whereby the telephone company, for a valuable consideration, agreed to maintain a certain number of free telephones in the city of Superior. The city had paid the consideration by permitting alterations to be made in its city hall and buildings as requested by the telephone company, and it was held that the passage of the public utility law did not affect the contract, since sec. 1797*m*—91 thereof expressly provided that 'the furnishing by any public utility, of any product or service at the rates and upon the terms and conditions provided for in any existing contract executed prior to April 1, 1907, shall not constitute a discrimination within the meaning specified.' It is obvious the case at bar does not come within the principle applied or the section referred to in the *Superior Case.*"

In the same manner the present case is distinguishable from the *Douglas County Case.* The ordinances relied on

in the instant case attempted to grant franchises and to barter the exercise of the police power for free current, and we hold that the section under consideration does not preserve such agreements as are relied on by appellant. They were not made by the city in its proprietary capacity and were without consideration.

It is argued by appellant that since the company accepted the ordinances relied on it cannot now be heard to claim that they were *ultra vires*. By its legislation the state has imposed new burdens upon companies of this character. When they became subject to the restrictions of the indeterminate permit they became entitled to its benefits. *Wis. T., L., H. & P. Co. v. Menasha,* 157 Wis. 1, 145 N. W. 231.

### Second cause of action.

The ground upon which the trial judge decided the second cause of action is, if his conclusions were correct, sufficient for the decision in this court. His conclusions are not attacked by the appellant, and they are supported by reason and authority. Appellant's counsel have, however, devoted their brief entirely to the claim of invalidity of the contract in its inception, and respondent's counsel state that they desire a decision upon that question because the contract is still in operation and its validity must be determined at some time. For these reasons it seems best to pass upon the validity of the contract at this time. Although the judgment in this cause of action was for only $123.14, the questions raised are numerous and are as perplexing as if the amount involved were a million dollars. There are four objections made by appellant.

1. That the contract is contrary to that part of sec. 3, art. XI, of the constitution which requires that any municipal corporation incurring any indebtedness shall, before or at the time of doing so, provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due, and also to pay the principal within twenty years.

Appellant concedes that this provision does not apply to

expenditures for ordinary running expenses, including electricity for park lighting and the cost of maintaining the system, and debts payable within a year out of incomes and revenues; but construes the contract in question as requiring the city to pay for the system in any event, if terminated in two years by paying the investment cost at that time, and if never terminated, counsel say, it obligates the city to pay the total investment cost within about twenty-two years. It is urged that this violates the constitution in that no tax was levied for the purpose and that the period of payment of the principal is not limited to twenty years.

We do not think that counsel correctly interpret the contract or the facts in their claim that the contract requires the city to pay for the system in instalments over a period of years or otherwise. An examination of the contract shows that there is no express provision to that effect. The only foundation for appellant's interpretation seems to lie in the provision for a depreciation reserve and in an assumption that the rate prescribed for its computation is not established simply to cover depreciation as an operating expense; on the contrary, that it is so excessive as to amount to payments upon the capital cost, upon an instalment plan, made under the evasive title of a depreciation reserve. We see no other explanation for the statement of counsel, as the cost of property retired from service is to be deducted from the reserve, and while the reserve may prove more than sufficient therefor it may, on the other hand, prove inadequate. It may prove that the city could never acquire the system thereby, or it may prove to be of such amount that at a certain time the city would acquire the system without further payment but would then acquire it in a worn-out condition.

Doubtless a contract could be drawn in which a charge purporting to be for the expense of depreciation could be made so excessive as to amount in fact to a contract for instalment payments upon a capital investment with the intent

of evading constitutional or statutory provisions. But there is no proof in the record that the depreciation reserve provided for in the contract in question exceeds its legitimate limits. It does not appear excessive on its face. In the absence of proof that the charge is excessive for the true purposes of covering the expense of depreciation, we cannot assume that it is other than it purports to be or that it is a payment upon capital. It is possible, though we need not now decide it, that if the reserve provided should prove in the future to be more than adequate for depreciation the railroad commission could modify the rate to conform to the needs.

A charge for depreciation is a necessary and proper element of the cost of each year's service; it is in the nature of an expense of operation, or a running expense, in at least as true a sense as is interest on the investment, and provision should be made therefor out of current earnings. *Miles v. People's Tel. Co.* 166 Wis. 94, 163 N. W. 652; *Knoxville v. Knoxville W. Co.* 212 U. S. 1, 13, 29 Sup. Ct. 148. See *Hill v. Antigo W. Co.* 3 Wis. R. R. Comm. Rep. 623, 641; *State Journal P. Co. v. Madison G. & E. Co.* 4 Wis. R. R. Comm. Rep. 501, 559; *In re Jefferson M. E. L. & W. Plant*, 5 Wis. R. R. Comm. Rep. 555, 560; *In re Fennimore M. W. & L. Plant*, 12 Wis. R. R. Comm. Rep. 194, 200. This feature of the contract, therefore, really falls within the concession of appellant's counsel as to expenditures to which the provision of the constitution does not apply; and the soundness of the concession is abundantly supported by authority. *Stedman v. Berlin*, 97 Wis. 505, 73 N. W. 57; *Herman v. Oconto*, 110 Wis. 660, 672, 86 N. W. 681; *Vaughn v. Montreal*, 124 Wis. 302, 102 N. W. 561; *Connor v. Marshfield*, 128 Wis. 280, 293, 107 N. W. 639.

The case of *Earles v. Wells*, 94 Wis. 285, 68 N. W. 964, is clearly different, as there the city obligated itself to pay the *principal and interest* of the bonds issued to cover the cost of the water plant in the form of so-called "rentals," and at

the end of the period of the "lease" the plant was to become the property of the city forthwith.

Appellant's counsel cite the fact that the contract obliges the city to pay the difference between the investment cost and the accumulated depreciation reserve upon its terminating the contract. But by this the city incurred no obligation. The termination of the contract is entirely at the option of the city. The respondent has no power to terminate it and thus obligate the city to pay anything. No indebtedness can be incurred under this feature of the contract unless and until the city exercises its option to terminate it. *Stedman v. Berlin,* 97 Wis. 505, 73 N. W. 57. The franchise in *Connor v. Marshfield,* 128 Wis. 280, 107 N. W. 639, contained a similar provision which was apparently considered unobjectionable. See, also, *Burnham v. Milwaukee,* 98 Wis. 128, 73 N. W. 1018.

Having adopted this construction of the contract it becomes unnecessary to more than allude to the various other arguments urged by respondent on this feature of the case, namely: that there may be included in the charges for service which may be contracted for in advance a charge for the amortization over a period of years of the investment involved; that the city is not in a position to take advantage of a violation such as is alleged, on the ground that the constitutional provision is not for the city's protection, or that it related to an independent and collateral act which the city should have performed, but, failing therein, may be required to perform later; and that the contract creates no indebtedness within the meaning of the constitution, because the amount to be paid is not presently fixed, referring to *Janes v. Racine,* 155 Wis. 1, 143 N. W. 707.

2. The second objection made by appellant to the contract is that it violates sec. 22 of ch. VI*a* of the Milwaukee charter (1914), which prohibits the park commissioners from expending or contracting a liability for any sum in excess of the amount levied in any year for the park fund on account

of such fund.    There is no proof that the amounts involved
in the contract may exceed the limits thus prescribed by the
charter.    There is no need of examining this objection
further.    ·

3.    The third objection of appellant to the contract is that
it calls for an expenditure of more than $200 and that no
competitive bids were asked.    There are three features of
the contract charge, distinguishable in character, to which
this claim may be applied: first, the charges for the mere
furnishing of electric current to the system; second, the
charges to reimburse respondent for the cost of building
and operating the special system itself; third, the payment to
be made by appellant upon the termination of the contract,
upon which title to the special system vests in the city.    It
does not clearly appear from appellant's brief which ones
or whether all of these classes of expenditures require a
contract let upon bids.

The provision of the charter relied on as requiring bidding
follows:

"All work and the purchase of supplies or material,
chargeable to any ward fund, or to any city fund, including
incidental printing, when the cost thereof shall exceed the
sum of $200, except street cleaning, shall be let by contract,
to the lowest bidder  .  .  .; and no indebtedness shall be
incurred in excess of the amount herein limited without a
formal contract, let to the lowest bidder, and all work done
or supplies and material purchased, exceeding in cost $200,
shall be done and purchased, when practicable, by said com-
missioner, by contract, which shall be let after due notice,
inviting proposals, in the manner provided for the letting of
contracts for the doing of public work.  .  .  ." Sec. 16, ch. V,
Milwaukee Charter (1914), under the caption "Department
of Public Works."

It is asserted that this governs expenditures of the board
of park commissioners, and sec. 16, ch. VIa, Milwaukee
Charter (1914), is cited to this effect.

Assuming that the park board is bound by the quoted
section, the question remains whether it would forbid their

entering into the contract in question without letting it upon bids. In so far as the expenditures come under the head of electric current furnished, appellant's contention is answered by *Hurley W. Co. v. Vaughn,* 115 Wis. 470, 476, 91 N. W. 971, and *Oconto E. Co. v. Peoples L. & M. Co.* 165 Wis. 467, 481, 161 N. W. 789. The words in the *Milwaukee* charter, "and the purchase of supplies or material," do not seem to make it any more applicable to such contracts than do the provisions under which these cases were decided, namely, in effect, that all contracts for work shall be let to the lowest bidder.

It seems clear that such provisions of charters are intended to apply to contracts where public policy requires that competition be had to obtain a reasonable charge for work performed for, or materials and the like supplied to, municipal corporations. With the passage of the public utility act our conclusion that bids are not required for utility service is further supported, for the spirit of that act is a recognition that competition is an inadequate regulator of the rates of public utilities, wherefore public control is substituted for competition. The rates for such services and the rate established by the contract in question are filed with the railroad commission under the act and are subject to action by it. To such expenditures this provision of the charter has no application.

Appellant urges that, even though no competition were possible for the furnishing of the current itself, nevertheless many firms could have undertaken to install the equipment in the park, and that charges for such installation therefore come within the provision of the charter. In so far as appellant's argument relates to the charge for reimbursing respondent for the cost of building and operating the special system, which we have here classed as the second feature of the contract charge, the principles we applied to the first feature of the charge seem still to apply. As we construe the contract, this part of the charge is to cover part of the ex-

penses of furnishing the service, namely, lighting the park, and the installation and operation of the special fixtures are incidental thereto. It is the lighting which is furnished to the city, and the installation is a necessary facility therefor. Though the park board might have chosen to install the equipment itself and buy the current alone, it has not done so. It has chosen to have the light furnished entirely by the company. The cost of the plant necessary to furnish the service thus becomes one of the expenses of the service rendered. Such service is not unusual. Probably the water company furnished the hydrants in *Hurley W. Co. v. Vaughn,* 115 Wis. 470, 91 N. W. 971, and quite certainly the electric company furnished the poles, wires, and lights for street lighting in *Oconto E. Co. v. Peoples L. & M. Co.* 165 Wis. 467, 161 N. W. 789, and in neither was it suggested that it altered the nature of the service or removed the contracts involved from the rule therein laid down.

By making the payment which we have classed as the third feature of the contract charge, namely, the payment upon termination of the contract, the city may get title to the special equipment and therein may more truly be considered as getting work or purchasing supplies or material within the intent of the charter provision. There are several answers, however, to appellant's objection to this feature of the contract charge. In the first place the purchase is entirely optional with the city. The city may never expend anything, nor acquire anything, under this provision of the contract. It does not now, therefore, and may never, violate the provision of the charter. Moreover, the purchase, if ever made, may or may not involve an expenditure of $200. The provision for payment on the termination of the contract may, it seems, be regarded as incidental to the service rendered, like the second feature of the charge, and as therefore falling within the cases cited. If the option be accepted, it may be for the purpose of abandoning the entire arrangement, not to acquire the installation. It may be

acquired merely to be superseded by a more modern method
of lighting.    The arrangement for this payment no doubt
enables the city to get a lower rate for service than would
otherwise be possible, and therein it is supplementary and
incidental to the service contract.    Moreover, in order to
get the service the city may properly contract for installing
the equipment.    Upon the termination of the agreement the
installation would become in large part useless unless the
city acquired it.    No calling for bids at that time could help
the situation.    Any arrangement other than that made
might result in great economic loss which a call for bids
could not remedy.    As in the matter of furnishing service,
the ultimate purchase of the equipment is taken out of the
intent of the charter provision by the public utility act, for
sub. 2, sec. 1797m—79, Stats., provides that a city may pur-
chase any part of a utility's plant by agreement with the
utility approved by the railroad commission.    The method
by which the purchase may be made under the agreement
is specified in that act, and no provision is made for competi-
tive bids.

It may be that in this cause of action the city should be
estopped, as it claims the company is in the first cause of
action, from questioning the validity of the contract.    But
we shall not discuss that here.

4.  The fourth objection made by appellant to the validity
of the contract is that it is not countersigned by the city
comptroller nor approved by the city attorney as to form
and execution, as it is alleged the city charter requires.    The
provision of the charter urged in appellant's brief as so
requiring is sec. 13, ch. V, Milwaukee Charter (1914),
which provides:

"All contracts entered into, and all public notices required
by law to be given by the commissioner of public works of
the city of *Milwaukee,* shall be countersigned by the comp-
troller of the said city, and shall have no force unless so
countersigned.    All contracts entered into by the said com-
missioner, and all bonds taken by him, shall be entered into

in the name of, and shall be executed to the city of *Milwaukee;* and all such bonds or contracts, when executed, shall be examined and approved, as to form and execution, by the city attorney."

It will be noted that the section, in terms, applies only to contracts entered into by the commissioner of public works, and it is in the chapter dealing with the duties of that officer. Ordinarily its operation would not be extended beyond his contracts. *Superior v. Norton,* 63 Fed. 357, 359. It is urged, however, that the provision applies to the park board by reason of the last clause of sec. 16, ch. VI*a,* of the charter, which reads as follows:

". . . and generally in regard to said parks and boulevards, the said board of park commissioners shall have and possess all powers and authority now by law conferred upon or possessed by the common council and board of public works of the city of *Milwaukee,* in respect to the public squares and places in said city."

Assuming that restrictions and methods of procedure imposed upon the commissioner of public works are imposed upon the park board along with the grant of the equivalent of his powers, nevertheless appellant's conclusion does not follow, for in respect to lighting the park board seems to get its powers by the reference to the powers and authority of the common council in said sec. 16, not by the reference to those of the commissioner of public works. The council, not the commissioner, has been given the power over lighting generally. Sub. 35, 35*a,* sec. 3, ch. IV, Milwaukee Charter (1914).

An objection presenting more difficulty is that raised at the oral argument on sec. 13, ch. III, Milwaukee Charter (1914), which reads as follows:

"He [the comptroller] shall examine all estimates of work to be done by the board of public works of the city, and countersign all contracts entered into by said board of public works, and all certificates of work given by them; and also all contracts made in behalf of the city; and no contract

entered into, or certificate issued against property shall be of any validity unless countersigned by the comptroller, except as otherwise expressly provided in this act."

*Superior v. Norton,* 63 Fed. 357, and *Lee v. Racine,* 64 Wis. 231, 25 N. W. 33, may be cited as lending weight to appellant's contention. The section comes from the chapter dealing in general with the powers and duties of. the comptroller, *inter alia,* and, it may be argued, is of general application and therefore a limitation upon the park board as upon other officers of the city. The provision dates from the general revision of the charter in 1874. Sec. 13, subch. III, ch. 184, Laws 1874. The statutes creating the park board and establishing the general system under which it operates date from 1889 and 1891. Ch. 488, Laws 1889; ch. 179, Laws 1891. It is therefore evident that the legislature in passing sec. 13, subch. III, did not specifically have in mind contracts entered into by the park board. That section appears by its terms to have had specific reference to contracts entered into by the board of public works, and in this respect differs from the provision in *Superior v. Norton, supra,* but it is also made applicable to other contracts.

The comptroller appears to be primarily an accounting officer and an officer to aid the council in establishing the tax rate. He is to make a report to the council on expenses and a detailed estimate of revenue necessary to be raised (sec. 12, ch. III, of the charter) ; he is to examine estimates of work to be done by the board of public works (sec. 13) ; he is to report to the council on prospective special taxes to be levied by it (sec. 14) ; he is to report monthly to the council the amount of work done, or for which contracts have been entered into, chargeable to ward funds, general city fund, or other funds (sec. 15) ; he is to examine accounts of officers receiving moneys (sec. 16) ; and is to audit claims to be allowed by the council (sec. 17). The above are with special reference to powers granted to him prior to the time of the establishment of the park board.

In ch. V of the charter, dealing with the commissioner (board) of public works, the duties of the comptroller are further defined. He is to countersign the commissioner's contracts (sec. 13); the commissioner is deprived of power by contract or otherwise to exceed in doing any work the sum appropriated by the council for that work in such year (sec. 14), and the commissioner is to deliver to the comptroller, with each contract to be countersigned, an estimate of the amount involved, and the comptroller is to keep a record of the estimates applicable to each fund and refuse to countersign any contract which will exceed the balance in the fund to which it is chargeable (sec. 15); and the comptroller is to have a like record of, and check on, expenditures to be made by the commissioner without formal contract (secs. 18, 19).

The general spirit of ch. VIa. of the charter, however, governing the park board is to make that board, in the improvement, maintenance, and control of the parks, as independent as possible of all other officers and bodies. The board is given the full and exclusive power to govern, manage, control, and improve the parks, to appoint its employees and fix their salaries, and generally in regard to the parks to have all the powers of the council or board of public works in respect to public places in the city (secs. 16, 18, 18a); they are to report to the comptroller, it is true, the names of appointees and the salary allowed, and he is to audit claims against the board and they are to report to him claims allowed by them, and the board is to report to the council in each year on its transactions, expenditures, and the like (secs. 20, 22). It is significant that the board is given power to itself determine, within statutory limits, the tax to be levied for its work, which is merely certified to the council and comptroller by them, and which must thereupon be included by the council in the general tax levy for the year (sec. 21). It is made unlawful for the board to contract a liability in excess of the amount levied in any one year for

the park fund (sec. 22). It is given power to contract for the purchase of lands and to lease lands, upon order of the common council, without any mention of countersignature by the comptroller.

It will readily be seen that the park board of the city of *Milwaukee* stands on a very different footing from that of Superior as set out in *Superior v. Norton,* 63 Fed. 357. The Superior board had to seek its funds in the same manner and through the same channels as other city officers, such as the board of public works, while the *Milwaukee* board stands on an independent and superior ground in this respect.

While the comptroller has certain important duties in connection with the *Milwaukee* park board they seem principally to do with the auditing of claims and accounts. Sec. 13, ch. III, on the other hand, appears to bear principally upon the making up of the necessary tax levies. The park board, however, has complete power to determine its own tax levy, and in view of this fact and the other features of the charter reviewed it seems that sec. 13, ch. III, was not intended by the legislature to apply to contracts of a body such as the park board which was later created.

*By the Court.*—Judgment affirmed.