160

## DAN M. GEPHART v. HOSPITAL FACILITY BUILDING COMMISSION AND OTHERS.

132 N. W. (2d) 738.

January 22, 1965—No. 39,308.

*Felhaber, Larson & Fenlon, Thomas M. Vogt, David E. Kelby,* and *Barry McGrath,* for appellant.

*R. J. Leonard, Terence J. O'Loughlin,* and *Doherty, Rumble & Butler,* for respondent Northern States Power Company.

*William B. Randall,* County Attorney, *Edward E. Cleary,* Assistant County Attorney, *Donald L. Lais,* Corporation Counsel, and *Robert E. O'Connell,* Assistant Corporation Counsel, for other respondents.

OTIS, JUSTICE.

This is a taxpayer's suit to enjoin the payment of $6,920 to Northern States Power Company for extending its electrical distribution system into St. Paul's newly constructed city-county hospital. The issue is whether or not the statute required competitive bidding. This appeal is from a summary judgment dismissing the action with prejudice.

The construction of the hospital was authorized and undertaken pursuant to L. 1957, c. 938, § 15 of which provides in part:

"Upon the completion of the plans and specifications and upon their approval and adoption by the governing body of the city and the board of county commissioners, the commission shall proceed to advertise for bids or proposals for all or any portion of the work or materials, or both, to be done, performed or furnished in the construction of the joint hospital facility. * * * At the time and place specified in the advertisement for the opening of bids or proposals, the commission shall meet, open the bids or proposals, tabulate the same, and shall thereupon award the contract or contracts to the responsible bidder whose bid or proposal is the most favorable to the city and the county, or reject all bids and proposals."

The following section of the plans and specifications prepared by the architect and approved by the Hospital Facility Building Commission is here pertinent:

"50-19. PRIMARY SERVICE AND EQUIPMENT

\* \* \* \* \*

"(b) Northern States Power Company will furnish and install dual service primary cables from the property line to the primary distribution switches in the hospital and will furnish and install in the two main switches a G&W pothead for each service entrance cable as indicated. All primary wiring beyond the potheads shall be furnished and installed by the Electrical Contractor. The Electrical Contractor shall furnish and install an undergound duct line for the above cables from 5 [sic] inside the property to the hospital as detailed on the drawings. The Electrical Contractor shall consult Northern States Power Company and shall pay them the cost of furnishing and installing the service entrance cables."

The power company accepted the commission's proposal in a letter dated March 26, 1962, wherein the relevant part of their agreement was confirmed in this manner:

"NSP will furnish and install the cable from the manhole to the main transformer room, however, the cost of the cable and installation from the property line to the transformer room will be paid for by the customer. NSP will retain ownership of the entire cable and will ·be responsible for the maintenance of it. The cost to be borne by the customer will be $7,670.00. NSP will make an allowance of $750.00 for the cost of six switches that we would furnish if the customer were not installing automatic throw-over equipment. Therefore, the contribution that is to be made to the Northern States Power Company will be $6,920.00."

Plaintiff is a taxpayer representing the National Electrical Contractors Association as its local manager. It is conceded that had the hospital purchased the cable outright, any competent electrical contractor could have installed it between the hospital transformer room and the power company's underground electrical system running to a manhole at the intersection of University Avenue and Jackson Street. The question is whether it was lawful to specify that the power company would install the cable for a flat fee without competitive bids and thereafter perpetually own and maintain it.

The trial judge was not entirely free from doubt in the matter, and we share his misgivings. Because experience has demonstrated the efficacy of calling for competitive bids before entering public contracts, courts have deplored shortcuts which are prompted by expediency.[1]

"Generally it is presumed that public officials have entered into public contracts in good faith and actual fraud in a particular instance must be proved, but this rule has no application in a determination of whether the requirements of competitive bidding have been met in the letting of a contract and, as a matter of sound public policy, such a contract is void, without any showing of actual fraud or an intent to

---

[1]Leskinen v. Pucelj, 262 Minn. 461, 469, 115 N. W. (2d) 346, 352.

commit fraud, if a procedure has been followed which emasculates the safeguards of competitive bidding.

"* * * A fundamental purpose of competitive bidding is to deprive or limit the discretion of contract-making officials in the areas which are susceptible to such abuses as fraud, favoritism, improvidence, and extravagance. Any competitive bidding procedure which defeats this fundamental purpose, even though it be set forth in the initial proposal to all bidders, invalidates the construction contract although subsequent events establish, as in the instant case, that no actual fraud was present." Griswold v. County of Ramsey, 242 Minn. 529, 535, 65 N. W. (2d) 647, 652.[2]

Respondents seek to justify the contract on the theory that it calls primarily for service to which construction is merely incidental, citing as authority Milwaukee Elec. Ry. & Light Co. v. City of Milwaukee, 173 Wis. 329, 345, 181 N. W. 298, 304. They assert that where competition is impossible or improbable it would be a useless form to invite bids.[3] It is further argued that a public utility is adequately regulated by its municipality without requiring additional safeguards. We are not altogether convinced by such arguments. Many of them have been previously considered and rejected by this court. Arpin v. City of Thief River Falls, 122 Minn. 34, 141 N. W. 833; Casey v. Central Elec. & Tel. Co. 202 Minn. 510, 279 N. W. 263. Nevertheless, there are factors here present which we believe sustain the trial court's decision.

This is a hospital facility and quite obviously its continuing operation depends to a great extent on the availability of uninterrupted electrical power. While theoretically other contractors might have bid on specifications which called for perpetual ownership in, and maintenance by, the successful bidder, it is highly unlikely that an ordinary

---

[2]See, also, Coller v. City of St. Paul, 223 Minn. 376, 387, 389, 26 N. W. (2d) 835, 841, 842; Ambrozich v. City of Eveleth, 200 Minn. 473, 481, 274 N. W. 635, 639; 112 A. L. R. 269; Diamond v. City of Mankato, 89 Minn. 48, 53, 93 N. W. 911, 912, 61 L. R. A. 448.

[3]Hurley Water Co. v. Town of Vaughn, 115 Wis. 470, 477, 91 N. W. 971, 973.

electrical contractor would be interested in such an arrangement. Nor in other hands would there be the assurance of continuity of service which is to be expected of a franchised utility responsible for supplying power and liable for its failure. Under these peculiar circumstances, we are of the opinion that the commission did not abuse the discretion, inherent in every public corporation, to exercise sound business judgment concerning contracts which do not lend themselves to open competitive bidding because of unique considerations not applicable to ordinary expenditures for public construction. Otter Tail Power Co. v. Village of Elbow Lake, 234 Minn. 419, 423, 49 N. W. (2d) 197, 201, 27 A. L. R. (2d) 906; Ambrozich v. City of Eveleth, 200 Minn. 473, 481, 274 N. W. 635, 639.

Affirmed.